ACCEPTED
01-14-01018-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/23/2015 4:46:51 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-14-01018-CV

**IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS
HOUSTON, TEXAS**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/23/2015 4:46:51 PM
CHRISTOPHER A. PRINE
Clerk

**RICKY D. PARKER AND JAMES MYERS**

*Appellants*

**v.**

**SCHLUMBERGER TECHNOLOGY CORPORATION**

*Appellee*

Interlocutory Appeal
from the 268th Judicial District Court of Fort Bend County, Texas
Cause No. 14-DCV-218252

**APPELLANTS RICKY D. PARKER AND JAMES MYERS' MOTION TO REVIEW JUNE 4, 2015 AMENDED TEMPORARY INJUNCTION**

Levon G. Hovnatanian
State Bar No. 10059825
*hovnatanian@mdjwlaw.com*
Robert T. Owen
State Bar No. 24060370
*owen@mdjwlaw.com*
Kevin G. Cain
State Bar No. 24012371
*cain@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON &
WISDOM, L.L.P.
808 Travis, 20TH Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

**TO THE HONORABLE COURT OF APPEALS:**

**Procedural Facts**

This is an interlocutory appeal of the Fort Bend County District Court's orders denying a motion to compel arbitration and granting a temporary injunction prohibiting the appellants Rick Parker and James Myers from working in the wireline industry. On April 30 2015, following oral argument, the Court entered an order sua sponte staying proceedings in the district court, with the sole exception that the district court was permitted to hear matters relating to the temporary injunction and was permitted to issue orders that modify or dissolve that injunction. On June 4, 2015 the district court signed an order modifying the injunction. *See* Supplemental Record & Appendix Tab 1.[1] The modified injunction maintains all of the substantive work restrictions as to both Parker and Myers but provides that the work restrictions expire on September 15, 2015 as to Parker alone. *See* Supplemental Record & Appendix Tab 1.

---

[1] Attached to the appendix to this motion are true and correct copies of (1) Appellants' Motion to Modify or Dissolve the Temporary Injunction; (2) Appellee's Response to the Motion to Modify or Dissolve the Temporary Injunction; and (3) the district court's June 4, 2015 Amended Temporary Injunction. Parker and Myers have also requested that the Fort Bend County District Clerk supplement the appellate record with these documents.

## Rule 29.6

The district court's June 4, 2015 order does not affect this Court's jurisdiction to adjudicate this interlocutory appeal. *See* Tex. R. App. P. 29.6. Rule 29.6 provides:

(a) *Motion to Review Further Orders*. While an appeal from an interlocutory order is pending on a party's motion or on the appellate court's own initiative, the appellate court may review the following:

    (1) a further appealable interlocutory order concerning the same subject matter; and

    (2) any interlocutory order that interferes with or impairs the effectiveness of the relief sought or that may be granted on appeal.

(b) *Record*. The party filing the motion may rely on the original record or may file a supplemental record with the motion.

Tex. R. App. P. 29.6.

The June 6, 2015 amended temporary injunction is an appealable interlocutory order concerning the same subject matter as this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(4) (Vernon 2015) ("(a) A person may appeal from an interlocutory order of a district court, county court at law, statutory probate court, or county court that . . . grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction as provided by Chapter 65."); Supplemental Record & Appendix Tab 1.

2

Accordingly, the appellants respectfully ask that the Court review the June 4, 2015 order in conjunction with the other issues pending in this appeal.

## Effect Of June 4, 2015 Order On The Appellate Issues

The June 4, 2015 Amended Temporary Injunction does not affect any issue in this appeal. The amended injunction maintains all of the substantive work restrictions previously imposed on Parker and Myers and constitutes an abuse of the trial court's discretion for all the reasons previously noted in Parker and Myers' appellate briefing. *See* Supplemental Record & Appendix Tab 1. The sole substantive change in the order is that it sets an expiration date of September 15, 2015 for the work restrictions as to Parker alone. *See* Supplemental Record & Appendix Tab 1.

However, that modification does not correct any substantive issue addressed in the parties' briefing or at oral argument. Indeed, as noted in appellants' prior briefing, an injunction prohibiting an employee from working cannot be properly based upon an expired non-compete. *See* Appellants' Brief at 53-54. It is undisputed that, absent some act tolling the non-compete at issue, Parker's non-compete expired on October 2, 2014, one year after he resigned his position with Schlumberger, and one week before the district court signed a temporary restraining order prohibiting him from working in the wireline industry. See 3 RR 31; 5 RR Pl.'s Ex. 1 at ¶ 5. As noted in the prior briefing, there is no evidence in

the record that supports any continued restriction on Parker's right to work. *See* Reply Briefing at 29-30. Accordingly, adding an expiration date of September 15, 2015 to Parker's work restrictions does not correct the substantive issues attendant to the temporary injunction and the amended temporary injunction remains an abuse of the trial court's discretion. The June 4, 2015 amended temporary injunction should be reversed and dissolved for all the reasons previously presented to the Court.

## Conclusion

Appellants Ricky Parker and James Myers respectfully request that the Court grant this motion to review the district court's June 4, 2015 order; reverse the trial court's orders denying their motion to compel arbitration and granting Schlumberger's application for temporary injunction and permit Parker and Myers to immediately resume work.

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.

By: */s/ Robert T. Owen*
    Levon G. Hovnatanian
    State Bar No. 10059825
    *hovnatanian@mdjwlaw.com*
    Kevin G. Cain
    State Bar No. 24012371
    *cain@mdjwlaw.com*
    Robert T. Owen
    *owen@mdjwlaw.com*
    State Bar No. 24060370
808 Travis, Suite 20th Floor
Houston, Texas  77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

**ATTORNEYS FOR APPELLANTS
RICKY D. PARKER AND JAMES MYERS**

5

## CERTIFICATE OF COMPLIANCE

This is to certify that this computer-generated motion contains 799 words.

/s/ Robert T. Owen
Robert T. Owen
Dated: June 23, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June, 2015, a true and correct copy of the foregoing was sent by the method(s) indicated to the following individuals:

Mr. Jeff Barnes                    *via e-file and e-mail: barnesj@jacksonlewis.com*
JACKSON LEWIS, P.C.
1415 Louisiana, Suite 3325
Houston, Texas 77002

Mr. William L. Davis              *via e-file and e-mail:  davisw@jacksonlewis.com*
JACKSON LEWIS, P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201

/s/ Robert T. Owen
Robert T. Owen

## APPENDIX

Tab 1 – June 4, 2015 Amended Temporary Injunction

Tab 2 – Motion To Modify Or Dissolve Temporary Injunction

Tab 3 – Response To Motion To Modify Or Dissolve Temporary Injunction

1



## ANNIE REBECCA ELLIOTT
DISTRICT CLERK
Fort Bend County, Texas

(281) 341-3754
Fax (281) 341-4519

**June 11, 2015**

TO:   **W. JACKSON WISDOM**
**MARTIN DISIERE JEFFERSON & WISDOM LLP**
**808 TRAVIS 20TH FLOOR**
**HOUSTON TX 77002**

Re:   Cause No. **14-DCV-218252**
**268TH JUDICIAL DISTRICT COURT**

**Schlumberger Technology Corporation vs Ricky D. Parker and James Myers**

Dear **W. JACKSON WISDOM**:

Please find enclosed the following:

**(1) CERTIFIED COPY OF THE AMENDED TEMPORARY INJUNCTION FORWARDED TO YOUR OFFICE FOR FURTHER HANDLING.**

DISTRICT CLERK ANNIE REBECCA ELLIOTT
Fort Bend County, Texas

By: _____
Deputy District Clerk Vanessa Vasquez
Telephone: (281) 341-3754

**MAILING**

301 Jackson Street

Richmond, Texas 77469

**PHYSICAL**

1422 Eugene Heimann Circle, Room 10142

Richmond, Texas 77469

http://www.fortbendcountytx.gov

Departments – District Clerk

**RECEIVED**

JUN 15 2015

JAMES M. CLEARY, JR.

**ORIGINAL**

Filed
5/29/2015 3:40:47 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Jennifer Melendez

CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, | § § | |
| Defendants. | § § | 268TH JUDICIAL DISTRICT |

## AMENDED TEMPORARY INJUNCTION

The Court enters this Amended Temporary Injunction following the hearing on Defendant Ricky Parker's Motion to Modify or Dissolve the Temporary Injunction that was held on May 15, 2015.

On December 5 and 8, 2014, the Court held a hearing on Plaintiff Schlumberger Technology Corporation's request for a temporary injunction. Plaintiff appeared at the hearing and offered evidence in support of the request for a temporary injunction. Defendants did not appear, but were represented by counsel at the hearing. The Court heard testimony and considered the evidence and arguments of the parties and finds as follows.

The Court finds that the evidence establishes the elements necessary for the issuance of a temporary injunction. Schlumberger has established a probable right to relief necessary to obtain a temporary injunction with respect to its claims for breach of contract and tortious interference with contract, tortious interference with prospective business relationships, breach of contract, breach of fiduciary duty and duty of loyalty, and aiding and abetting breach of fiduciary duty and duty of loyalty. Ricky Parker sold the assets of his business (Parker Energy Services) to Schlumberger. He signed the agreement in Houston, Texas. In connection with the sale, he and James Myers entered into Intellectual Property, Confidential Information, and Non-



ROUTED TO COURT 06|01|15
RT'D TO D. CLERK 06|05|15

Compete Agreements with Schlumberger (the "ICN Agreements") – Plaintiff's Exhibits 1 and 2.

The ICN Agreements contain detailed and specific definitions of Confidential Information, Intellectual Property, and Company Intellectual Property and the restrictions relating to the use and disclosure of Confidential Information:

> "Company Confidential Information" is defined as: technical information, software, databases, methods, know-how, formulae, compositions, drawings, designs, data, prototypes, processes, discoveries, machines, inventions, well logs or other data, equipment, drawings, notes reports, manuals, business information, compensation data, clients lists, client preferences, client needs, client designs, financial information, credit information, pricing information, information relating to future plans, marketing strategies, new product research, pending projects and proposals, proprietary design processes, research and development strategies, information relating to employees, consultants and independent contractors including information relating to salaries, compensation, contracts, benefits, inceptive plans, positions, duties, qualifications, project knowledge, other valuable confidential information, trade secrets, patent applications, and related filings regardless of whether or not identified as confidential or proprietary, and similar items.

> "Intellectual Property" is defined as: all patents, trademarks, copyrights, trade secrets, Company Confidential Information, new or useful arts, ideas, discoveries, inventions, improvements, software, business information, lists, information considered by Company to be confidential, designs, drawings, writings, contributions, works of authorship, findings or improvements, formulae, processes, product development, manufacturing techniques, business methods, tools, routines and methodology, documentation, systems, enhancements or modifications thereto, know-how, and developments, any derivative works and ideas whether or not patentable, and any other form of intellectual property.

> "Company Intellectual Property" is defined as: all Intellectual Property, that was authored, conceived, developed, or reduced to practice by Employee (either solely or jointly with others) during the term of his/her employment. Company Intellectual Property may be originated or conceived during the term of Employee's employment but completed or reduced to practice thereafter. Company Intellectual Property shall be deemed a "work made for



hire" as that term is defined by the copyright laws of the United States. Company Intellectual Property also includes any "Pre-existing Intellectual Property" assigned, licensed, or transferred to Company, and any "Preexisting Intellectual Property" in which Company has a vested or executory interest.

The ICN Agreements also contained one year restrictions on certain competitive activities after their employment ended. Paragraph 5 of the ICN Agreements provides that while employed by Schlumberger, and for a period of one year after their employment with Schlumberger ended, they would not directly or indirectly work for or assist, (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is in direct or indirect competition with the area of Schlumberger's business in which they were employed. The area of business where James Myers and Ricky Parker were employed was the wireline, slick line and braided line services for oil and gas wells. The one-year restriction provides for an extension of time while they were breaching the restrictions. Both Parker and Myers breached paragraph 5 of their ICN Agreements.

Paragraph 13 of the ICN Agreements contains a restriction on soliciting Schlumberger employees. Both Parker and Myers breached paragraph 13 of their ICN Agreements.

James Myers signed a Retention Bonus Contract in connection with the sale of the business – Plaintiff's Exhibit 3. Pursuant to the terms of the Retention Bonus Contract, Myers was paid money in connection with the sale of the business and in exchange for his agreement to remain employed for a period of two years after he signed the agreement. He also agreed not to use or disclose Confidential Information, and agreed to return all documents, email communications, computer data and other Company materials, whether or not they contain Confidential Information, upon the separation from employment with the Company or upon



request. Paragraph 5 of the Retention Bonus Contract provides that during his employment with the Company and for a period of one year following the end of his employment, he would not:

(a) Solicit, contact, or accept work, which was the same or substantially similar to the work and/or services performed by him for the Company, from clients of the Company with whom he had business dealings during his employment with the Company.

(b) Provide services (including consulting services) which are the same or substantially similar to services and/or work performed by him for the Company, for clients of the Company with whom he had business dealings during his employment with the Company.

(c) Solicit, recruit, encourage, hire or assist any other person or entity to solicit, recruit, encourage or hire for employment any employee or independent contractor of the Company to work for a competitor.

(d) Directly or indirectly own, manage, operate, control, be employed by, be a consultant for, or perform any job functions for, any business that is in competition with the Company.

The testimony established that the Company for purposes of the Retention Bonus Contract was the Parker Energy Services business acquired by Schlumberger which provided wireline, slick line and braided line services to oil and gas wells. The geographic territory specified in the Retention Bonus Contract is the territory serviced by the offices where Myers worked. Myers had management responsibilities over offices in Oklahoma, Pennsylvania, and Arkansas. The counties served by these offices are identified in Plaintiff's Exhibit 74, which is attached to this ORDER and incorporated herein.

Myers has breached paragraph 5 of the Retention Bonus Contract. The Retention



Bonus Contract provides that Myers entitlement to the $100,000.00 Bonus Award is contingent upon his complying with paragraph 5 as written. Schlumberger paid the Bonus Award to Myers and he has not returned the money.

Both Ricky Parker and James Myers were in management roles at Schlumberger and also had extensive contact with Schlumberger customers. They had access to, and used, Confidential Information as defined in the agreements at issue. Access and use was necessary for them to secure business for Schlumberger, staff the jobs, and service the customers. They also visited customers, learned their business needs and preferences, and communicated with other Schlumberger managers and sales representative regarding strategies for developing business. They were both the beneficiaries of the goodwill Schlumberger developed with existing customers.

Ricky Parker resigned from Schlumberger on October 2, 2013. He continued to come to the Schlumberger offices and continued to have access to information regarding Schlumberger's business after his employment ended. Without informing Schlumberger, he ordered six trucks costing approximately $360,000.00 each in January of 2014. The trucks were for use in the business he was forming, PWL-LLC, which would do business under the name Professional Wireline. The trucks were designed for performing wireline, slick line and braided line services for oil and gas wells. PWL is the same abbreviation used by Schlumberger in describing its "Production Wireline" business. Parker also purchased tools, supplies, equipment, and had Myers assist him while still employed by Schlumberger. He also registered the PWL-LLC business with the Texas Secretary of State indicating that it would do business in Texas and purchased insurance from a Texas-based insurance broker. He also completed a Vendor Profile seeking to do business with one of Schlumberger's clients stating that services would be



performed by the competing business in Texas, Oklahoma, and Arkansas.

Schlumberger confronted James Myers regarding what he knew about the competing business and he claimed to have no knowledge, and also confirmed that he would not go to work for the competing business. Contrary to his representations, James Myers planned to go to work for the competing business. Ricky Parker took delivery of the trucks and then Schlumberger employees, while still employed by Schlumberger and during working hours, visited the new business location where the trucks were delivered.

James Myers also began going to the new business location, while still employed by Schlumberger, during business hours. He was also using a Schlumberger vehicle. He also worked with Parker to obtain offers of employment for Schlumberger employees and set up a meeting with Schlumberger employees to present the offers. On September 16, 2014, Myers left his Schlumberger truck at the Schlumberger offices, but the tool boxes and tools normally in the truck were missing. While misrepresenting to Schlumberger that he was not resigning, and while still employed by Schlumberger, James Myers set up a meeting with several Schlumberger employees and they met with him on the evening of September 16. On September 17, 2014, eleven Schlumberger employees tendered their resignations with no advance notice to go to work for Parker and Myers in the competing business. The sudden departure of these employees and missing equipment caused Schlumberger to be unable to service customers. At the same time, Myers began meeting with Schlumberger's customers on September 17, 2014, to solicit business from the customers. To facilitate solicitation of the customers and convince them to transfer business to the PWL, Myers took several former Schlumberger employees with him to show the customers that PWL could offer the services of the same employees who had been performing work for them at Schlumberger. Professional Wireline began performing work for these



customers shortly after these meetings after obtaining Master Service Agreements "MSA's" with the customers. Three such MSA's with customers (BP, XTO and Linn Energy) contain Texas choice of law and choice of venue provisions. Professional Wireline has performed work in Texas and several of the customers at issue are based in Texas.

Professional Wireline has also copied its HSE materials from Schlumberger HSE materials acquired in the purchase of the Parker Energy Services business. One of the employees who left Schlumberger to work for Professional Wireline, Daniel Harrison, also accessed the Parker Energy Services email account after his employment ended and forwarded client information such as work orders containing pricing and job safety analysis reports to his PWL-LLC email account. Defendants also admit taking a Parker Energy Services price list which the testimony from Plaintiff established was confidential. James Myers also retained his cell phone he used at Schlumberger for communicating with customers, and that phone has now been given to one of the former employees who left Schlumberger to go to work for Professional Wireline so he could use it while the temporary restraining order was in place.

The breaches, both during Myers' employment and during the one-year non-compete period of Myers' and Parker's ICN Agreements, were intended to divert the business to the new business operated by Myers and Parker. Further, the business names used by them, "PWL" and "Professional Wireline" is similar to the name used by Schlumberger — Production Wireline or "PW."

Defendants did not appear at the original hearing set for October 24, 2014, nor did they appear at the injunction hearing on December 5 or 8, 2014. Defendants did not comply with the original Temporary Restraining Order entered on October 9, 2014. In the deposition testimony of Defendants admitted into evidence at the injunction hearing, Defendants offered as

an excuse for their breaches that they never read the agreements. The Court concludes that Defendants will continue to breach their agreements unless enjoined.

The Established Customers of the Schlumberger business at issue are reflected in Plaintiff's exhibit 13. The counties where Schlumberger offices managed by Defendants performed work are reflected in Plaintiff's Exhibit 74.

The Court further finds that immediate and irreparable injury, loss, or damage will result to Plaintiff unless this temporary injunction is entered. Unless immediately restrained, the Defendants' breach of the agreements will cause irreparable harm to Schlumberger for which there is no adequate remedy at law, including loss of existing customers and employees, loss of business opportunities, loss of goodwill and business reputation, and loss of confidential information. Money damages cannot adequately compensate Schlumberger. A temporary injunction is necessary to preserve Schlumberger's rights pending a trial on the merits and warranted by the plain language and requirements of the agreements.

It is, therefore ORDERED, that James Myers and Ricky Parker, their agents, servants, employees, and anyone in active concert or participation with them who receive actual notice of this Order ("Enjoined Parties") is/are hereby enjoined as follows:

1. Enjoined Parties shall not retain, conceal, move, or share with others any of Schlumberger's equipment, property, documents, reports, files, books, records, or Confidential Information or Company Intellectual Property.

2. Enjoined Parties shall immediately provide to Schlumberger any and all external storage devices that James Myers or Ricky Parker ever put Schlumberger Company Confidential Information or Company Intellectual Property on that is in the Enjoined Parties' possession.



3. Enjoined Parties shall not delete or destroy any Schlumberger property, Company Confidential Information or Company Intellectual Property contained on any computer, phone, disc, data storage device, email account, or cloud storage.

4. Enjoined Parties shall not disclose Schlumberger's Company Confidential Information or Company Intellectual Property for any reason.

5. Enjoined Parties shall not directly or indirectly recruit, hire, solicit, or assist others in recruiting, hiring, or soliciting employees of Schlumberger.

6. Enjoined Parties shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operations of wireline, slick line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached.

7. Enjoined Parties shall not solicit, contact, or accept wireline, slick line or braided line work and/or services, from the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana.

8. Enjoined Parties shall not provide, or supervise, advise, manage, or serve as a consultant for businesses who are performing, wireline, slick line or braided line work for the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana.

With respect to Defendant Parker only, the restrictions contained in Paragraphs 5-8 shall expire on September 18, 2015.

Plaintiff previously posted a $50,000.00 bond. No further bond is required. The clerk of this court shall issue a temporary injunction in conformity with the law and the terms of this Order. Until that time, the original Temporary Injunction Order entered on December 18, 2014 remains in effect.

The Court is not setting this cause for trial in connection with this Amended Temporary Injunction due to the stay ordered by the First Court of Appeals.

SIGNED on this ___ day of _____, 2015, at 2:36 o'clock p.m.

JUDGE PRESIDING

AGREED:

/s/ Jeff Barnes
Jeff Barnes, Counsel for Plaintiff

AGREED AS TO FORM ONLY:

/s/ James Cleary
James Cleary, Counsel for Defendant Ricky Parker

I, Annie Rebecca Elliott, District Clerk of Fort Bend County, Texas, do hereby certify that the foregoing is a true, correct and full copy of the instrument herein set out as appears of record in the District Court of Fort Bend County, Texas. This ___ day of _____ 20_

ANNIE REBECCA ELLIOTT, DISTRICT CLERK
By_____ Deputy

VANESSA VASQUEZ

**2**

Filed
5/6/2015 12:35:21 PM
**Annie Rebecca Elliott**
District Clerk
Fort Bend County, Texas
Jennifer Melendez

## CAUSE NO 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY, | § | IN THE DISTRICT COURT |
| CORPORATION | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| vs. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| RICKY D. PARKER and JAMES MYERS, | § | |
| Defendants. | § | 268th JUDICIAL DISTRICT |

### DEFENDANT RICKY D. PARKER'S MOTION
### TO MODIFY OR DISSOLVE TEMPORARY INJUNCTION

Defendant Ricky D. Parker files this Motion to Modify or Dissolve the Court's December 18, 2014 Temporary Injunction and respectfully show the following:

### PROCEDURAL HISTORY

On October 9, 2014, the Court signed a temporary restraining order prohibiting Parker and Myers from competing with Schlumberger.[1] On December 5 and 8, 2014, the Court held an evidentiary hearing to determine whether Schlumberger was entitled to a temporary injunction prohibiting Parker and co-defendant Jimmy Myers from working in the wireline, slick-line, and braided line industry. The Court concluded that that Schlumberger was entitled to such an injunction and signed a temporary injunction on December 18, 2014, indefinitely enjoining Parker and Myers from working in the wireline industry.[2]

Parker and Myers subsequently perfected an interlocutory appeal of that injunction, as well as the Court's earlier order denying their motion to compel Schlumberger's claims to arbitration.[3] On April 30, 2015, two days after oral argument to the court of appeals, Justice

---

[1] *See* October 9, 2014 Temporary Restraining Order.

[2] *See* December 18, 2014 Temporary Injunction, attached as Exhibit 1.

[3] *See* Notice of Interlocutory Appeal.

1

Jane Bland issued an order providing: "The court ORDERS a stay of all proceedings in the trial court pending resolution of the interlocutory appeal, except that the trial court may hear matters relating to the temporary injunction and may issue orders that modify or dissolve that injunction."[4] As contemplated by the court of appeals' order, Parker asks to modify and dissolve its December 18 injunction and permit Parker to return to work in the wireline, slick-line, and braided line industry.[5] Parker is not seeking a modification or dissolution of the Court's injunction as it pertains to Schlumberger's confidential information.

## SUMMARY OF THE ARGUMENT

The non-compete forming the basis of the Court's temporary restraining order and temporary injunction prohibiting Parker from working expired by its own terms on October 2, 2014, one year after Parker resigned his position with Schlumberger.[6] Moreover, employees are permitted to prepare to compete with their current or former employers absent a contractual agreement providing otherwise. *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The non-compete at issue prohibits actual present competition, not preparations that would permit competition at a later date. Parker's non-compete with Schlumberger is long expired, and there is no evidence that supports continuing the Court's now five month prohibition on Parker's constitutional right to work in the wireline industry. Accordingly, in compliance with the First Court of Appeals' April 30 order, Parker respectfully requests that the Court dissolve its prohibition on Parker's constitutional right to work.

---

[4] April 30, 2015 Order, attached as Exhibit 2.

[5] This motion to dissolve or modify concerns the Court's indefinite injunction of Parker only. Myers does not move to dissolve or modify the injunction as it pertains to him at this time, but reserves the right to do so in the future.

[6] Exhibit 3.

## BACKGROUND FACTS

In connection with his sale of Parker Energy Services Co. to Schlumberger's predecessor in interest, Parker agreed to work for Schlumberger and signed an "Intellectual Property, Confidential Information, and Non-Compete" Agreement ("ICN Agreement"), which provided:

> Employee agrees for a period of one (1) year following the date of termination of his/her employment with Company, Employee will not directly or indirectly work for or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is – even in part – in direct or indirect competition with any area of the Company's business in which Employee was employed by Company.
>
> * * *
>
> If Employee is found to have breached any promise made in [the non-compete provision] of this Agreement, the one-year period specified in [the non-compete provision] shall be extended by the period of time for which Employee was in breach.[7]

Parker worked for Schlumberger from September 2011 until October 2, 2013.[8] Accordingly, unless extended by the tolling provision, the ICN Agreement's non-compete requirements expired on October 2, 2014.[9]

At the December 2014 hearing on Schlumberger's application for temporary injunction, Schlumberger elicited evidence showing that, in January 2014, Parker ordered trucks and other equipment that could be used to perform wireline, slick-line, and braided line work.[10] There was no evidence however, that Parker, individually, or that PWL, LLC ("PWL"), Parker's employer, solicited any wireline work before September 17, 2014, fifteen days before the expiration of the

---

[7] Exhibit 3.

[8] *Id.*

[9] *Id.*

[10] Exhibit 4 at 35, 41, 103, 106-09, 112.

3

non-compete.[11] It is also undisputed, and indisputable, that PWL did not perform its first job until September 29, 2014.[12]

The Court concluded that Schlumberger was entitled to a temporary injunction and signed an order that indefinitely prohibits Parker from working in the wireline industry, providing, in pertinent part:

> 6.    Enjoined Parties shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operations of wireline, slick line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached.
>
> 7.    Enjoined Parties shall not solicit, contact, or accept wireline, slick line or braided line work and/or service, from the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana.
>
> 8.    Enjoined Parties shall not provide, or supervise, advise, manage, or serve as a consultant for businesses who are performing, wireline, slick line or braided line work for the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana.[13]

There is no temporal limitation in the Court's temporary injunction.[14]

## ARGUMENT AND AUTHORITIES

Covenants not to compete are restraints on trade and unenforceable as a matter of public policy unless they are reasonable restraints. *See Juliette Fowler Homes, Inc., v. Welce Assocs., Inc.*, 793 S.W.2d 660, 662 (Tex. 1990); *see also* TEX. BUS. & COMM. CODE § 15.50(a). Indeed, "[c]ovenants against competition are generally not favored by our courts because of the public policy against restraints of trade and the hardships resulting from interference with a person's

---

[11] Exhibit 4 at 48.

[12] Exhibit 4 at 68.

[13] December 18, 2014 Temporary Injunction, attached as Exhibit 1.

[14] December 18, 2014 Temporary Injunction, attached as Exhibit 1.

4

means of livelihood." *Martin v. Linen Sys. for Hospitals, Inc.*, 671 S.W.2d 706, 709 (Tex. App.—Houston [1st Dist.] 1984, no writ). "Noncompetes tailored to protectable business interests have their lawful place, but they should be used sparingly and drafted narrowly. And employers must demonstrate special facts that legitimize the noncompete agreement. Squelching competition for its own sake is an interest unworthy of protection. Competition by a former employee may well rile an employer, but companies do not have free rein to, by contract, indenture an employee or dampen everyday competition that benefits Texas and Texans." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 788 (Tex. 2011) (Willet, J., concurring).

Under Texas law, Schlumberger is entitled to a temporary injunction barring Parker from working only if the evidence shows that the restraints on trade sought are reasonably limited in time, geographical area, and scope of activity to be restrained. TEX. BUS. & COMM. CODE § 15.50(a). A restraint on trade is unnecessary if it is broader than necessary to protect the legitimate interests of the employer. *Gallahger Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 654 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Whether a covenant not to compete is reasonable is a legal question for the court. *Haass*, 818 S.W.2d at 386. The burden of proving the necessity for and the reasonableness of the non-competition covenant falls upon the employer. *Martin*, 671 S.W.2d at 709. A covenant not to compete cannot be enforced absent a record that demonstrates the limitations are reasonable and as nonburdensome as possible. *Marsh USA Inc.*, 354 S.W.3d at 785.

### *An Injunction Prohibiting An Employee From Working Cannot Be Properly Based Upon An Expired Non-Compete.*

It is undisputed that, absent some act tolling the agreement, Parker's non-compete expired on October 2, 2014, one year after he resigned his position with Schlumberger, and one week before this Court signed a temporary restraining order prohibiting him from working in the

5

wireline industry.[15] However, Schlumberger argued, and the Court concluded, that Parker was "preparing to go in competition" by his purchase of equipment in January 2014, which, the Court concluded, tolled and extended the non-compete past its October 2, 2014 expiration date.[16] Respectfully, Schlumberger has led the Court to error because the purchasing of equipment is not contemporaneous competition prohibited by ICN Agreement and is perfectly proper under the First Court of Appeals' binding precedent.

In *Abetter Trucking Co. v. Arizpe*, the First Court of Appeals held: "[T]o resign from one's employment and go into business in competition with one's former employer is, under ordinary circumstances, a constitutional right. *There is nothing legally wrong in engaging in such competition or in preparing to compete before the employment terminates*." 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (emphasis added) (citations omitted). It is only where a covenant not to compete specifically prohibits preparing to compete that one may be prohibited from engaging in such preparations. *See id*.

The ICN Agreement on which the Court's temporary injunction is derived does not preclude Parker from "preparing" to compete, it provides that, for a period of one year, he may not "*work for or assist* . . . any business . . . whose business *is* . . . in direct or indirect competition with [Schlumberger]."[17] Such language only precludes Parker from working for businesses in *present* competition with Schlumberger.[18] It is undisputed, and indisputable, that PWL was not in present competition with Schlumberger until either September 17, 2014, when it first attempted to solicit wireline customers or September 29, 2014, when it performed its first

---

[15] Exhibit 3.

[16] Exhibit 5 at 119-120, 122-124.

[17] Exhibit 3.

[18] *Id.*

6

wireline job.[19]  Such acts would, at most, entitle Schlumberger to a fifteen day extension of the non-compete.[20]  However, as the Court's indefinite temporary injunction has now prohibited Parker from working for five months, any extension of the non-compete to which Schlumberger may have been entitled from the September 2014 solicitation and work is now long expired.

To conclude that the non-compete provision extends beyond actual active competition and precludes Parker from *preparing* to compete in the future, improperly adds restrictions to the agreement and is improper under Texas law. *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex. App.—Amarillo 1987, writ ref'd n.r.e.) ("The ultimate restraint is that a court cannot, through the construction process, make a new contract for the parties, one they did not make."). The Court's injunction, which penalizes Parker for preparing to compete, violates Texas public policy because persons may properly "prepare[] to compete" with their former employers absent an express agreement to the contrary. *Abetter Trucking Co.*, 113 S.W.3d at 510. Accordingly, Parker's purchasing of equipment in 2014 cannot have properly tolled the non-compete as Schlumberger suggested. *Id.*

Schlumberger has received more than the benefit of its bargain from its non-compete and Parker has been prohibited from working for months after the Schlumberger's non-compete expired under its own terms. As the non-compete has expired and there is no evidence supporting any continued prohibition on Parker's constitutional right to work, Parker respectfully requests that the Court modify its December 18, 2014 injunction and dissolve the portions thereof prohibiting him from working in the wireline, slick-line, and braided line industry as

---

[19] Exhibit 4 at 48, 68.

[20] *See* Exhibit 3.

7

required by as required by the Business and Commerce Code.  *See* TEX. BUS. & COMM. CODE § 15.50(a).

## CONCLUSION

For the reasons noted above, the defendant, Ricky Parker, respectfully requests that the Court modify its temporary injunction and permit him to return to work in the wireline industry, as is his constitutional right.

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.

By:  */s/ James M. Cleary, Jr.*
     W. Jackson Wisdom
     State Bar No. 21804025
     *wisdom@mdjwlaw.com*
     James M. Cleary
     State Bar No. 00783838
     *cleary@mdjwlaw.com*
808 Travis Street, 20th Floor
Houston, Texas 77002
Telephone:  (713) 632-1700
Facsimile:  (713) 222-0101

**ATTORNEYS FOR DEFENDANTS**
**RICKY D. PARKER AND JAMES MYERS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was sent via e-mail, certified mail, return receipt requested, and/or hand delivery on this 6th day of May, 2015, to the following:

Jeff Barnes             *Via E-mail and CMRRR 7010 1060 0002 4061 8497*
JACKSON LEWIS P.C.
1415 Louisiana, Suite 3325
Houston, Texas 77002
Email: barnesj@jacksonlewis.com

William L. Davis        *Via E-mail and CMRRR 7010 1060 0002 4061 8503*
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
Email: DavisW@jacksonlewis.com

Kyle Sears            *Via Hand Delivery*
808 Travis, 20th Floor
Houston, Texas 77002


*/s/ James M. Cleary, Jr.*
James M. Cleary, Jr.

# EXHIBIT 1

Filed
12/12/2014 12:07:44 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ariana Salazar

CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, | § § | |
| Defendants. | § § | 268TH JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION

On December 5 and 8, 2014, the Court held a hearing on Plaintiff Schlumberger Technology Corporation's request for a temporary injunction. Plaintiff appeared at the hearing and offered evidence in support of the request for a temporary injunction. Defendants did not appear, but were represented by counsel at the hearing. The Court heard testimony and considered the evidence and arguments of the parties and finds as follows.

The Court finds that the evidence establishes the elements necessary for the issuance of a temporary injunction. Schlumberger has established a probable right to relief necessary to obtain a temporary injunction with respect to its claims for breach of contract and tortious interference with contract, tortious interference with prospective business relationships, breach of contract, breach of fiduciary duty and duty of loyalty, and aiding and abetting breach of fiduciary duty and duty of loyalty. Ricky Parker sold the assets of his business (Parker Energy Services) to Schlumberger. He signed the agreement in Houston, Texas. In connection with the sale, he and James Myers entered into Intellectual Property, Confidential Information, and Non-Compete Agreements with Schlumberger (the "ICN Agreements") – Plaintiff's Exhibits 1 and 2. The ICN Agreements contain detailed and specific definitions of Confidential Information,

ROUTED TO COURT 12·10·14 ACS
RT'D TO D. CLERK 12/18/14 YY

296

Intellectual Property, and Company Intellectual Property and the restrictions relating to the use and disclosure of Confidential Information:

"Company Confidential Information" is defined as: technical information, software, databases, methods, know-how, formulae, compositions, drawings, designs, data, prototypes, processes, discoveries, machines, inventions, well logs or other data, equipment, drawings, notes reports, manuals, business information, compensation data, clients lists, client preferences, client needs, client designs, financial information, credit information, pricing information, information relating to future plans, marketing strategies, new product research, pending projects and proposals, proprietary design processes, research and development strategies, information relating to employees, consultants and independent contractors including information relating to salaries, compensation, contracts, benefits, inceptive plans, positions, duties, qualifications, project knowledge, other valuable confidential information, trade secrets, patent applications, and related filings regardless of whether or not identified as confidential or proprietary, and similar items.

"Intellectual Property" is defined as: all patents, trademarks, copyrights, trade secrets, Company Confidential Information, new or useful arts, ideas, discoveries, inventions, improvements, software, business information, lists, information considered by Company to be confidential, designs, drawings, writings, contributions, works of authorship, findings or improvements, formulae, processes, product development, manufacturing techniques, business methods, tools, routines and methodology, documentation, systems, enhancements or modifications thereto, know-how, and developments, any derivative works and ideas whether or not patentable, and any other form of intellectual property.

"Company Intellectual Property" is defined as: all Intellectual Property, that was authored, conceived, developed, or reduced to practice by Employee (either solely or jointly with others) during the term of his/her employment. Company Intellectual Property may be originated or conceived during the term of Employee's employment but completed or reduced to practice thereafter. Company Intellectual Property shall be deemed a "work made for hire" as that term is defined by the copyright laws of the United States. Company Intellectual Property also includes any "Pre-existing Intellectual Property" assigned, licensed, or transferred to

2

Company, and any "Preexisting Intellectual Property" in which Company has a vested or executory interest.

The ICN Agreements also contained one year restrictions on certain competitive activities after their employment ended. Paragraph 5 of the ICN Agreements provides that while employed by Schlumberger, and for a period of one year after their employment with Schlumberger ended, they would not directly or indirectly work for or assist, (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is in direct or indirect competition with the area of Schlumberger's business in which they were employed. The area of business where James Myers and Ricky Parker were employed was the wireline, slick line and braided line services for oil and gas wells. The one-year restriction provides for an extension of time while they were breaching the restrictions. Both Parker and Myers breached paragraph 5 of their ICN Agreements.

Paragraph 13 of the ICN Agreements contains a restriction on soliciting Schlumberger employees. Both Parker and Myers breached paragraph 13 of their ICN Agreements.

James Myers signed a Retention Bonus Contract in connection with the sale of the business – Plaintiff's Exhibit 3. Pursuant to the terms of the Retention Bonus Contract, Myers was paid money in connection with the sale of the business and in exchange for his agreement to remain employed for a period of two years after he signed the agreement. He also agreed not to use or disclose Confidential Information, and agreed to return all documents, email communications, computer data and other Company materials, whether or not they contain Confidential Information, upon the separation from employment with the Company or upon request. Paragraph 5 of the Retention Bonus Contract provides that during his employment with the Company and for a period of one year following the end of his employment, he would not:

3

(a) Solicit, contact, or accept work, which was the same or substantially similar to the work and/or services performed by him for the Company, from clients of the Company with whom he had business dealings during his employment with the Company.

(b) Provide services (including consulting services) which are the same or substantially similar to services and/or work performed by him for the Company, for clients of the Company with whom he had business dealings during his employment with the Company.

(c) Solicit, recruit, encourage, hire or assist any other person or entity to solicit, recruit, encourage or hire for employment any employee or independent contractor of the Company to work for a competitor.

(d) Directly or indirectly own, manage, operate, control, be employed by, be a consultant for, or perform any job functions for, any business that is in competition with the Company.

The testimony established that the Company for purposes of the Retention Bonus Contract was the Parker Energy Services business acquired by Schlumberger which provided wireline, slick line and braided line services to oil and gas wells. The geographic territory specified in the Retention Bonus Contract is the territory serviced by the offices where Myers worked. Myers had management responsibilities over offices in Oklahoma, Pennsylvania, and Arkansas. The counties served by these offices are identified in Plaintiff's Exhibit 74, which is attached to this ORDER and incorporated herein.

Myers has breached paragraph 5 of the Retention Bonus Contract. The Retention Bonus Contract provides that Myers entitlement to the $100,000.00 Bonus Award is contingent upon his complying with paragraph 5 as written. Schlumberger paid the Bonus Award to Myers

4

and he has not returned the money.

Both Ricky Parker and James Myers were in management roles at Schlumberger and also had extensive contact with Schlumberger customers. They had access to, and used, Confidential Information as defined in the agreements at issue. Access and use was necessary for them to secure business for Schlumberger, staff the jobs, and service the customers. They also visited customers, learned their business needs and preferences, and communicated with other Schlumberger managers and sales representative regarding strategies for developing business. They were both the beneficiaries of the goodwill Schlumberger developed with existing customers.

Ricky Parker resigned from Schlumberger on October 2, 2013. He continued to come to the Schlumberger offices and continued to have access to information regarding Schlumberger's business after his employment ended. Without informing Schlumberger, he ordered six trucks costing approximately $360,000.00 each in January of 2014. The trucks were for use in the business he was forming, PWL-LLC, which would do business under the name Professional Wireline. The trucks were designed for performing wireline, slick line and braided line services for oil and gas wells. PWL is the same abbreviation used by Schlumberger in describing its "Production Wireline" business. Parker also purchased tools, supplies, equipment, and had Myers assist him while still employed by Schlumberger. He also registered the PWL-LLC business with the Texas Secretary of State indicating that it would do business in Texas and purchased insurance from a Texas-based insurance broker. He also completed a Vendor Profile seeking to do business with one of Schlumberger's clients stating that services would be performed by the competing business in Texas, Oklahoma, and Arkansas.

Schlumberger confronted James Myers regarding what he knew about the competing

5

300

business and he claimed to have no knowledge, and also confirmed that he would not go to work for the competing business. Contrary to his representations, James Myers planned to go to work for the competing business. Ricky Parker took delivery of the trucks and then Schlumberger employees, while still employed by Schlumberger and during working hours, visited the new business location where the trucks were delivered.

James Myers also began going to the new business location, while still employed by Schlumberger, during business hours. He was also using a Schlumberger vehicle. He also worked with Parker to obtain offers of employment for Schlumberger employees and set up a meeting with Schlumberger employees to present the offers. On September 16, 2014, Myers left his Schlumberger truck at the Schlumberger offices, but the tool boxes and tools normally in the truck were missing. While misrepresenting to Schlumberger that he was not resigning, and while still employed by Schlumberger, James Myers set up a meeting with several Schlumberger employees and they met with him on the evening of September 16. On September 17, 2014, eleven Schlumberger employees tendered their resignations with no advance notice to go to work for Parker and Myers in the competing business. The sudden departure of these employees and missing equipment caused Schlumberger to be unable to service customers. At the same time, Myers began meeting with Schlumberger's customers on September 17, 2014, to solicit business from the customers. To facilitate solicitation of the customers and convince them to transfer business to the PWL, Myers took several former Schlumberger employees with him to show the customers that PWL could offer the services of the same employees who had been performing work for them at Schlumberger. Professional Wireline began performing work for these customers shortly after these meetings after obtaining Master Service Agreements "MSA's" with the customers. Three such MSA's with customers (BP, XTO and Linn Energy) contain Texas

6

301

choice of law and choice of venue provisions. Professional Wireline has performed work in Texas and several of the customers at issue are based in Texas.

Professional Wireline has also copied its HSE materials from Schlumberger HSE materials acquired in the purchase of the Parker Energy Services business. One of the employees who left Schlumberger to work for Professional Wireline, Daniel Harrison, also accessed the Parker Energy Services email account after his employment ended and forwarded client information such as work orders containing pricing and job safety analysis reports to his PWL-LLC email account. Defendants also admit taking a Parker Energy Services price list which the testimony from Plaintiff established was confidential. James Myers also retained his cell phone he used at Schlumberger for communicating with customers, and that phone has now been given to one of the former employees who left Schlumberger to go to work for Professional Wireline so he could use it while the temporary restraining order was in place.

The breaches, both during Myers' employment and during the one-year non-compete period of Myers' and Parker's ICN Agreements, were intended to divert the business to the new business operated by Myers and Parker. Further, the business names used by them, "PWL" and "Professional Wireline" is similar to the name used by Schlumberger – Production Wireline or "PW."

Defendants did not appear at the original hearing set for October 24, 2014, nor did they appear at the injunction hearing on December 5 or 8, 2014. Defendants did not comply with the original Temporary Restraining Order entered on October 9, 2014. In the deposition testimony of Defendants admitted into evidence at the injunction hearing, Defendants offered as an excuse for their breaches that they never read the agreements. The Court concludes that Defendants will continue to breach their agreements unless enjoined.

7

302

The Established Customers of the Schlumberger business at issue are reflected in Plaintiff's exhibit 13. The counties where Schlumberger offices managed by Defendants performed work are reflected in Plaintiff's Exhibit 74.

The Court further finds that immediate and irreparable injury, loss, or damage will result to Plaintiff unless this temporary injunction is entered. Unless immediately restrained, the Defendants' breach of the agreements will cause irreparable harm to Schlumberger for which there is no adequate remedy at law, including loss of existing customers and employees, loss of business opportunities, loss of goodwill and business reputation, and loss of confidential information. Money damages cannot adequately compensate Schlumberger. A temporary injunction is necessary to preserve Schlumberger's rights pending a trial on the merits and warranted by the plain language and requirements of the agreements.

It is, therefore ORDERED, that James Myers and Ricky Parker, their agents, servants, employees, and anyone in active concert or participation with them who receive actual notice of this Order ("Enjoined Parties") is/are hereby enjoined as follows:

1. Enjoined Parties shall not retain, conceal, move, or share with others any of Schlumberger's equipment, property, documents, reports, files, books, records, or Confidential Information or Company Intellectual Property.

2. Enjoined Parties shall immediately provide to Schlumberger any and all external storage devices that James Myers or Ricky Parker ever put Schlumberger Company Confidential Information or Company Intellectual Property on that is in the Enjoined Parties' possession.

3. Enjoined Parties shall not delete or destroy any Schlumberger property,

8

303

Company Confidential Information or Company Intellectual Property contained on any computer, phone, disc, data storage device, email account, or cloud storage.

4. Enjoined Parties shall not disclose Schlumberger's Company Confidential Information or Company Intellectual Property for any reason.

5. Enjoined Parties shall not directly or indirectly recruit, hire, solicit, or assist others in recruiting, hiring, or soliciting employees of Schlumberger.

6. Enjoined Parties shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operations of wireline, slick line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached.

7. Enjoined Parties shall not solicit, contact, or accept wireline, slick line or braided line work and/or services, from the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana.

8. Enjoined Parties shall not provide, or supervise, advise, manage, or serve as a consultant for businesses who are performing, wireline, slick line or braided line work for the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana.

Plaintiff previously posted a $5,000.00 bond. The bond is increased to $50,000.00. Upon posting the additional $45,000.00 bond, the clerk of this court shall issue a temporary injunction in conformity with the law and the terms of this Order. Until that time, the

9

304

Temporary Restraining Order as extended in the Second Agreed Order Extending Temporary Restraining Order entered on November 13, 2014, shall be extended and remains in effect.

It is further ORDERED that the trial of this cause shall commence on the _17_ day of _March 2015_ at _4:00_ .

SIGNED on this _15_ day of December ____, 2014, at _3:05_ o'clock _p_.m.

_____
JUDGE PRESIDING

10

# EXHIBIT 2



ORDER

Appellate case name:     Ricky D. Parker and James Myers v. Schlumberger Technology
                         Corporation

Appellate case number:   01-14-01018-CV

Trial court case number: 14-DCV-218252

Trial court:             268th District Court of Fort Bend County

      The court ORDERS a stay of all proceedings in the trial court pending resolution of the interlocutory appeal, except that the trial court may hear matters relating to the temporary injunction and may issue orders that modify or dissolve that injunction.

      It is so ORDERED.


Judge's signature: /s/ Jane Bland
               ☒ Acting individually     ☐ Acting for the Court


Date: April 30, 2015

# EXHIBIT 3

## INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION, AND NON-COMPETE AGREEMENT

THIS AGREEMENT is made by and between Schlumberger Technology Corporation, a Texas corporation acting for itself and on behalf of its Affiliates as more fully defined below (hereinafter collectively referred to as "Company") and ___Rick Drler___ (hereinafter referred to as "Employee"), and shall be effective as of the ___10___ day of ___Sept.___, 20 _11_.

In consideration of the Company's employment of Employee, the Company's promise to provide Employee with Company Intellectual Property, as defined in Paragraph 5 below, the Company providing Employee with Company Intellectual Property, or the Company providing Employee with access to Company Intellectual Property, the payment of a salary or other remuneration, and other consideration, the Parties agree as follows:

1. Definitions.

   1.1. "Intellectual Property" is all patents, trademarks, copyrights, trade secrets, Company Confidential Information, new or useful arts, ideas, discoveries, inventions, improvements, software, business information, lists, information considered by Company to be confidential, designs, drawings, writings, contributions, works of authorship, findings or improvements, formulae, processes, product development, manufacturing techniques, business methods, tools, routines and methodology, documentation, systems, enhancements or modifications thereto, know-how, and developments, any derivative works and ideas whether or not patentable, and any other form of intellectual property.

   1.2. "Company Intellectual Property" is all Intellectual Property, that was authored, conceived, developed, or reduced to practice by Employee (either solely or jointly with others) during the term of his/her employment. Company Intellectual Property may be originated or conceived during the term of Employee's employment but completed or reduced to practice thereafter. Company Intellectual Property shall be deemed a "work made for hire" as that term is defined by the copyright laws of the United States. Company Intellectual Property also includes any "Pre-existing Intellectual Property" assigned, licensed, or transferred to Company, and any "Pre-existing Intellectual Property" in which Company has a vested or executory interest.

   1.3. "Pre-existing Intellectual Property" is all Intellectual Property that were authored, conceived, developed, or reduced to practice by Employee before the term of Employee's employment with the Company began.

   1.4. "Company Confidential Information" includes technical information, software, databases, methods, know-how, formulae, compositions, drawings, designs, data, prototypes, processes, discoveries, machines, inventions, well logs or other data, equipment, drawings, notes reports, manuals, business information, compensation data, clients lists, client preferences, client needs, client designs, financial information, credit information, pricing information, information relating to future plans, marketing strategies, new product research, pending projects and proposals, proprietary design processes, research and development strategics, information relating to employees, consultants and independent contractors including information relating to salaries, compensation, contracts, benefits, inceptive plans, positions, duties, qualifications, project knowledge, other valuable confidential information, trade secrets, patent applications, and related filings regardless of whether or not identified as confidential or proprietary, and similar items.

   1.5. "Affiliate" means any entity which now or in the future directly or indirectly controls, is



EXHIBIT

B

controlled by, or is under common control with Company, where "control" in relation to a company means the direct or indirect ownership of at least fifty-percent of the voting securities or shares.

2. Employee agrees to promptly disclose in writing to Company all Company Intellectual Property. Company Intellectual Property shall remain the exclusive property of Company whether or not deemed to be a "work made for hire" within the meaning of the copyright laws of the United States.

Any and all rights, title, and ownership interests, including copyright, that Employee may have in or to Company Intellectual Property or any tangible media embodying such Company Intellectual Property, as well as any U.S. and international applications for patent or copyright registrations thereon during and subsequent to his/her employment are hereby assigned to Company, and Company shall have the royalty-free right to use such existing Company Intellectual Property without any further agreement between Company and Employee. Employee, however, does not assign or agree to assign to Company any Pre-existing Intellectual Property.

During and after employment with Company, Employee shall assist Company in obtaining patents, copyrights, and other indicia of ownership, protection for such inventions and copyrightable materials, including completing and executing any necessary documents, contracts, or agreements, with respect to all such Company Intellectual Property which Company shall, in its sole discretion, determine to obtain.

Employee shall disclose to Company Employee's complete written record of any Company Intellectual Property, including any patent applications, correspondence with patent agents and patent offices, research, written descriptions of the technology, test data, market data, notes, and any other information relating to Company Intellectual Property. Employee shall also identify all co-inventors, co-authors, co-composers, partners, joint venturers, assistants, or other people to whom the Company Intellectual Property was disclosed in whole or in part, who participated in developing the Company Intellectual Property, or who claim an interest in the Company Intellectual Property. Employee's disclosure shall conform to the policies and procedures in place at the time governing such disclosures.

Employee shall not destroy, modify, alter, or secret any document, tangible thing, or information relating to Company Intellectual Property or Company Intellectual Property except as occurs in the ordinary performance of Employee's employment.

3. Except as required in performing Employee's duties for the Company, Employee will not remove from Company's facilities any Company Confidential Information including but not limited to equipment, drawings, notes, reports, manuals, invention records, software, customer information, well logs or other data, or other material, whether produced by Employee or obtained from Company. This includes copying or transmitting such information via Personal Digital Assistants, mobile phones, external hard drives, USB "flash" drives, USB storage devices, FireWire storage devices, floppy discs, CD's, DVD's, personal email accounts (including web-based email accounts such as Hotmail, Gmail, Yahoo), memory cards, Zip discs, and all other similar media which can be used to transmit electronic data.

4. Employee agrees to deliver all such Company Confidential Information and materials to Company immediately upon request, and in any event upon termination of employment. If any such Company Confidential Information has been stored on any personal electronic data storage device, including a home or personal computer, Employee agrees to make available the device to the Company for removal and/or copying of the information. Employee will not publish or disclose or transfer to any person, other than in the proper performance of Employee's duties for the Company, or use in any way other than in Company's business, any trade secrets or confidential technical or business

information or material of Company—including Company Intellectual Property and Company Confidential Information, either during or after employment with Company.

5. Upon the signing of this Agreement, or reasonably soon thereafter, and in any event prior to the termination of Employee's employment, the Company will provide Employee and Employee will receive access to Company Confidential Information which is proprietary, confidential, valuable, and relates to Company's business.

Employee recognizes and acknowledges that Company Confidential Information, both tangibly recorded or memorized, constitutes valuable trade secrets belonging to Company. In order to protect Company against any unauthorized use or disclosure of Company Confidential Information, and in exchange for the Company's promise to provide Employee with access to Company Confidential Information and other consideration prior to the termination of his/her employment, Employee agrees that for a period of one (1) year following the date of termination of his/her employment with Company, Employee will not directly or indirectly work for or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company. Moreover, Employee agrees that Company may provide a copy of this Agreement to any entity for whom Employee provides services in the one (1) year period following the date of termination of Employee's employment with Company.

Employee recognizes and acknowledges that the Company's business, research and products are by nature worldwide in scope, and that the Company is not required to maintain a physical location in close proximity to its customers. Employee agrees that in order to protect Company Confidential Information, business interests and goodwill, the foregoing restriction on Employee's subsequent employment shall extend to any county, parish, borough, or foreign equivalent: (1) in which Employee had a customer or service assignment for Company in the one-year period preceding Employee's termination; (2) in which Company has customers or service assignments about which Employee obtained Company Intellectual Property during his/her employment with Company; (3) in which Company has a manufacturing site, development site, work site, job site, or offices; and/or (4) in which any business or commercial operation whose business (a) is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company or (b) has a manufacturing site, development site, work site, job site, or offices.

Employee shall comply with all Company's policies and codes of ethics as it may promulgate from time to time, including those related to intellectual property, confidential information, Company Confidential Information, and Company Intellectual Property. Nothing in those policies shall be deemed to modify, reduce, or waive Employee's obligations herein and in the event of any conflict or ambiguity, this Agreement prevails.

6. The obligations in the foregoing section do not apply to Employee if Employee is a lawyer licensed to practice law in any state in the United States and whose employment for the Company involves the practice of law where such duties in this Agreement would abrogate, modify, or contradict any applicable rules of professional conduct, codes of ethics, or professional responsibility obligations. However, to the maximum extent possible all duties in this Agreement—including duties of non-disclosure and confidentiality—shall be applicable to such lawyers to the extent they do not abrogate, modify, or contradict any applicable rules of professional conduct, codes of ethics, or professional responsibility obligations.

7. If Employee is found to have breached any promise made in Paragraph 5 of this Agreement, the one-year period specified in Paragraph 5 shall be extended by the period of time for which Employee was in breach so that Company has the full benefit of the one-year periods specified in Paragraph 5.

8. Employee acknowledges that Company has agreed to provide Employee with Company Confidential Information during Employee's employment with Company. Employee further acknowledges that, if Employee was to leave the employ of Company for any reason and use or disclose, directly or indirectly, Company Confidential Information, that such use and/or disclosure would cause Company irreparable harm and injury for which no adequate remedy at law exists. Therefore, in the event of the breach or threatened breach of the provisions of this Agreement by Employee, Company shall be entitled to obtain injunctive relief to enjoin such breach or threatened breach, in addition to all other remedies and alternatives which may be available at law or in equity. Employee acknowledges that the remedies contained in the Agreement for violation of this Agreement are not the exclusive remedies which Company may pursue.

9. Company has attempted to place the most reasonable limitations on Employee's subsequent employment opportunities consistent with the protection of Company's valuable trade secrets, Company Confidential Information, business interests, and goodwill. Employee acknowledges that the limitations contained herein, especially limitations as to time, scope, and geography, are reasonable. In order to accommodate Employee in obtaining subsequent employment, Company may, in its discretion, grant a waiver of one or more of the restrictions on subsequent employment contained in Paragraph 5. A request for a waiver shall be in writing and must be received by Company at least forty-five (45) days before the proposed starting date of the employment for which Employee is seeking a waiver. The request must include the full name and address of the organization with which Employee is seeking employment; the department or area in which Employee proposes to work; the position or job title to be held by Employee; and a complete description of the duties Employee expects to perform for such employer. If Company decides to grant a waiver (which shall be solely in Company's discretion), the waiver may be subject to such restrictions or conditions as Company may impose and shall not constitute a waiver of any other term.

10. Any waiver of any term of this Agreement by Company shall not operate as a waiver of any other term of this Agreement, nor shall any failure to enforce any provision of this Agreement operate as a waiver of Company's right to enforce any other provision of this Agreement.

11. Company does not wish to receive from Employee any confidential or proprietary information of a third party to whom Employee owes an obligation of confidence. Accordingly, Employee represents and warrants that any information Employee either discloses to Company or uses while employed by Company is not subject to any obligation of confidentiality to any former employer or other third party. Employee acknowledges that his or her performance of this Agreement and his or her duties as an employee of Company do not and will not breach any agreement to keep in confidence proprietary information, knowledge, or data acquired by Employee prior to Employee's employment with Company.

12. Employee is not a party to any other agreement that will interfere with Employee's full compliance with this Agreement or that otherwise may restrict Employee's employment by Company or the performance of Employee's duties for Company. Employee agrees not to enter into any agreement, whether oral or written, in conflict with this Agreement.

13. Employee agrees that while employed by Company, and during the one-year period following the termination of his/her employment, Employee will neither directly nor indirectly, on his/her own behalf or on behalf of any person or entity, in any capacity, recruit, hire, solicit, or assist others in recruiting, hiring, soliciting any person, who is, or was, during the period of Employee's employment with Company, an employee or consultant of Company.

14. This Agreement may be enforced by, shall inure to the benefit of, and be binding upon Company, its successors, and assigns. This Agreement is binding upon Employee's heirs and legal representatives. By accepting a transfer to an Affiliate of Company, Employee agrees to the automatic assignment of

this Agreement to said Affiliate contemporaneously with the acceptance of such transfer, subject to subsequent agreements executed by Employee and Affiliate of Company or Company, and to the fullest extent allowed by law.

15. By accepting a transfer to an Affiliate of Company, Employee agrees to the automatic application of all of the terms of this Agreement to said Affiliate contemporaneously with the acceptance of such transfer, subject to subsequent agreements executed by Employee and Affiliate of Company or Company, and to the fullest extent allowed by law.

16. This Agreement or any part thereof may be modified, superseded, waived, or amended only in writing signed by an authorized representative of Company and by Employee. Any appendices to this Agreement are part of this Agreement as if wholly incorporated herein.

17. Because Employee may work in various locations and to eliminate potential uncertainty over the governing law, this Agreement shall be interpreted and construed exclusively in accordance with the laws of the State of Texas. Venue for any dispute(s) arising from or related to this Agreement shall lie solely, and is convenient, in Fort Bend County, Texas. Employee consents to the choice of law and venue provisions of this Agreement and agrees that Employee will not contest these provisions in any future proceeding(s). Employee agrees that Texas, as Company's United States Headquarters, has a greater legal interest in matters relating to this Agreement than any other state, has a greater public policy interest in matters relating to this Agreement than any other state, and has a greater factual relationship to matters relating to this Agreement than any other state.

18. Should any portion of this Agreement be held judicially invalid, unenforceable, or void, such holding will not have the effect of invalidating or voiding the other portions of this Agreement not so declared or any part thereof, the parties hereby agreeing that the portion so held to be invalid, unenforceable, or void shall be deemed amended, reduced in scope or deleted to the extent required to be valid and enforceable in the jurisdiction of such holding. The parties agree that, upon a judicial finding of invalidity, unenforceability, or voidability, the court so finding may reform the agreement to the extent necessary for enforceability, and enter an order enforcing the reformed Agreement. No court ordered reformation or amendment shall give rise to a finding of knowing, willfulness, or bad faith unreasonableness against Company regarding this Agreement.

19. This Agreement and Appendix contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes any previous understandings or agreements, whether written or oral, in respect of such subject matter.

SCHLUMBERGER TECHNOLOGY
CORPORATION

Signed: _W. illie S._

Printed Name: _Debbie Silas_

Title: _HR Rep_

Date: _9/10/11_

I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THIS AGREEMENT, AND THAT I AGREE TO ABIDE BY ITS TERMS.

EMPLOYEE

Signed: _____

Printed Name: _Ricky Parker_

Date: _9/10/11_

# EXHIBIT 4

REPORTER'S RECORD
VOLUME 3 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 14-DCV-218252

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/2/2015 3:39:27 PM
CHRISTOPHER A. PRINE
Clerk

SCHLUMBERGER TECHNOLOGY ) IN THE DISTRICT COURT
CORPORATION )
)
vs. ) FORT BEND COUNTY, TEXAS
)
RICKY D. PARKER AND JAMES )
MYERS ) 268TH JUDICIAL DISTRICT

TEMPORARY INJUNCTION HEARING

December 5, 2014 - Afternoon Session

On December 5, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Brady G. Elliott, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

APPEARANCES

MR. W. JACKSON WISDOM
MR. JAMES "JIM" M. CLEARY
MARTIN DISIERE, JEFFERSON & WISDOM
808 TRAVIS, 20TH FLOOR
HOUSTON, TEXAS 77002
Telephone:  713.632.1700
Counsel for Defendants

MR. BILL DAVIS
MR. JEFF BARNES
JACKSON LEWIS, P.C.
1415 LOUISIANA, SUITE 3325
HOUSTON, TEXAS 77002
Telephone:  713.568.7860
Counsel for Plaintiff

"Q:   What were you signing?

"A:   Honestly, I don't remember on that text.

"Q:   Did it relate to P.W.L. business?

"A:   I don't know.  I don't remember."

MR. DAVIS:  Moving to Page 7, Line 5:

"Q:   Page 3, we have a text September 13, 2014 from you to Mr. Myers that says -- quote -- 'Testing,' and it's 'L.U.B.', which I understand is lubricator -- dash, quote -- 'Wednesday'?

"A:   Uh-huh.

"Q:   Is that what you were talking about, testing a lubricator?

"A:   That's correct.

"Q:   And that's for the P.W.L. business, right?

"A:   I believe it was."

MR. DAVIS:  Moving down to Page -- to Line 25 of Page 7:

"Q:   Well, so we've got three texts while Mr. Myers was still employed by Schlumberger where you're texting him about what's going on?

"A:   What I'm doing.

"Q:   At the P.W.L. competing business, right?

to signing it, did you?

"A: No.

"Q: But it's your position now that you shouldn't have to abide by it, right?"

MR. DAVIS: And then Mr. Cleary objected.

MR. CLEARY: I'll withdraw the objection.

"A: No, I never read it.

"Q: So you can't point to anything in there that you think is unreasonable?"

MR. DAVIS: There's an objection.

MR. CLEARY: Yeah, it's a legal conclusion.

THE COURT: Overruled.

"A: I don't know. I haven't read it."

MR. DAVIS: And moving down to Page 44, Line 9:

"Q: Let's go through the calendar here. We've got October 2, 2013 is your best recollection of when you resigned from Schlumberger, right?

"A: Correct.

"Q: And we know that on September 17, which is within one year, you were hiring employees of Schlumberger to work for your new business, right?

"A: Uh-huh.

"Q: And yes? You need to answer yes or

"A:   That's correct.

"Q:   But it's your position, even though that -- even though that you signed this as part of the asset purchase agreement, that it's unreasonable or that you shouldn't have had to comply with that?"

MR. DAVIS:   And there's an objection.

MR. CLEARY:   Yeah, he's asking him to give a legal conclusion as to whether or not the agreement is enforceable.

THE COURT:   Overruled.

"A:   I did not know this was part of the asset purchase.

"Q:   Well, you know you signed it on September, 10, 2011, right?

"A:   Uh-huh.

"Q:   And you didn't object to signing it, did you?

"A:   No.   Some of the guys did.

"Q:   Well, we'll talk about that in a second.

"You didn't -- Before you were paid 17 million as part of the asset sale, you didn't raise your hand and say -- quote -- 'Wait a minute, that wasn't part of the deal, I'm not signing this,' did you?

"A:   No."

optional completeness, I'd like to read Page 62, Line 20:

"Q:  Did you talk to Mr. Myers about what tools and equipment might be needed?

"A:  No."

MR. CLEARY:  That's it.

MR. DAVIS:  Okay.  Page 63, Line 22:

"Q:  It looks like you got your insurance from Upstream Brokers out of Houston, Texas, right?

"A:  Correct."

MR. DAVIS:  Page 64, Line 18:

"Q:  Mr. Parker, it's my understanding that in addition to the wireline trucks, you also had pickup trucks that you were assigning to the operators when they came over to P.W.L., correct?

"A:  Yes, I had pickup trucks that I had bought.

"Q:  And when were those purchased?

"A:  I don't remember.  End of August, first of September.

"Q:  How many was it, eight?

"A:  I believe it was eight or nine. Seven, eight, or nine.  Eight or nine.

"Q:  And you bought those -- it's your testimony you bought them not knowing how many people

somewhere, right?

"A: Eventually.

"Q: Okay. But you actually went to work for P.W.L. the very next day, right?

"A: The very next day, yes, sir."

MR. CLEARY: If we could go back to Page 13, beginning at Line 13:

"Q: The contact on the 17th was a phone call or meeting?

"A: Meeting.

"Q: Did you arrange for the meeting before the 17th?

"A: No, sir.

"Q: You just showed up?

"A: That's right.

"Q: At what location?

"A: McAlester."

MR. BARNES: Page 18, Line 22:

"Q: When was the first job for X.T.O. for P.W.L.?

"A: September the 29th."

MR. BARNES: Page 20, Line 18:

"Q: What communications did you have with Unit after you left Schlumberger?

"A: Told them the same, that I had

when you questioned him about the drop in revenues while he was there, about business being slow?

A   I would tend to question it now --

MR. WISDOM:  Objection; based on speculation.

THE COURT:  Overruled.

THE WITNESS:  I would question it now based on what I know.

Q   (BY MR. DAVIS) What is it that you've learned?

A   That Mr. Myers has left the company and gone to work for the competition and left without, you know, discussing with us.  You know, that's not normal even, you know, in a retirement situation.

Q   Well, you heard the testimony from Mr. Myers and Mr. Parker about the text messages.  Does that cause you any concern?

A   Yes.  The text messages seem to show that Mr. Myers was -- and Mr. Parker were getting equipment, getting tools, and getting M.S.A.'s for their competing business.

MR. WISDOM:  Objection.  It's speculation and misstating what the documents actually say.

THE COURT:  Overruled.

Q   (BY MR. DAVIS) And was this in the same timeframe that the revenues for that location were

MR. WISDOM: Objection; leading.

THE WITNESS: That's correct.

THE COURT: Don't lead.

Q (BY MR. DAVIS) Now, I don't want to get bogged down in the missing tools. Now we have -- but we do have the tools from the rat pack. Have you done an investigation to see if Mr. Myers actually dropped them off at the McAlester location?

A Yes, we have. Immediately upon my arrival, one of our concerns was the security of the McAlester facility, concerns of missing tools and such. So I immediately had the crews go down to McAlester and go through the equipment and see what we have, inventory, and verify if any of the tools from -- that were in the rat pack were down there.

And so the crews went down there, and they started moving the equipment and informed me that, no, none of the tools were there.

Q And you --

A Similar tools were there, but not the ones that we specifically were looking for.

Q Okay. Would these tools be helpful for whoever was going to take over for Mr. Myers in servicing the customer?

A Yes, sir. It would save them some money, and

then some of them had to be, you know, ordered, may take a little bit longer. And not only that, they were kind of expensive. Specialized overshots for fishing operations were kept in Mr. Myers' pickup. He was the fishing expert, also. And so we don't have any of those.

Q    And you've heard -- well, you've testified about all of the customers he visited on the 17th. Would those tools be helpful if he was going to begin working immediately for customers for Professional Wireline?

A    Yes, sir, they would.

Q    And outside of the rat pack, have you done any investigation to see whether there were any other missing tools?

Well, let me ask a different question.

Do you have any -- was Mr. Myers responsible for ordering tools for Schlumberger?

A    He was. And I went back and had -- as this rolled out, I went back and had our financial controller pull our M.N.S. report and looked into the purchases that we had done throughout that year. And I guess starting back in April, we had purchased what could be construed as tooling out a truck. I mean, there were some specific gauge rings ranging from -- I believe it's

one-and-three-quarter, all the way up to four-and-a-half-inch O.D.

THE COURT REPORTER: I'm sorry. Up to?

THE WITNESS: Four-and-a-half-inch O.D.

Q (BY MR. DAVIS) So you -- are you saying that Mr. Myers was ordering tools while he was at Schlumberger in April?

A Yes, sir, he was. He did it throughout the year.

Q Okay. But a particular tool order, what was your concern about that when you say "tooling out a truck"?

A My concern was that he had maybe taken these tools and put them on the new trucks that he -- that they had at Profession Wireline.

Q Well, what was it?

MR. WISDOM: Your Honor, I object to the speculation of the illegal activity. He has no evidence. He's simply putting his conspiracy theories out there with no foundation.

THE COURT: Overruled.

Q (BY MR. DAVIS) Did you have any new trucks going into service in April of 2014?

A No, sir, we didn't.

Q And the order you looked at, what did it look

like was being ordered?  Did it have to do with a new truck?

A    Yeah, it would be gauge rings for a new truck. And then the other thing I noticed on this specific order is the overshots, and these grapples that are on here are required for overshots.  Can't find those overshots -- I mean, those grapples.  They're missing.

Q    And what is Exhibit 8?

A    Exhibit 8 is a -- it's from our -- it's a report from our financial controller that shows the P.O., the date, the vendor, the part number, and the description of the tools that were ordered.

Q    And is Exhibit 8 a record kept in the ordinary course of a regularly conducted business activity at Schlumberger?

A    For Schlumberger, yes, sir.

Q    And was making this record a regular practice to document that activity?

A    Yeah, it's a transaction from one system to the other.  And we run the reports, you know, to check the purchases and stuff.

Q    And was this record made at or near the time by or from information transmitted by someone with knowledge of the information in the report?

A    This report was made by our financial

It's still hearsay. It still should not be admitted. And it's still irrelevant.

THE COURT: Well, as to the hearsay objection, as information that's compiled in the regular course of business, therefore, it's not hearsay. With the annotation removed from it, I'll admit it on that basis.

**DIRECT EXAMINATION (CONTINUED)**

BY MR. DAVIS:

Q   Okay. We talked about the --

THE COURT REPORTER: I'm sorry. That was No. 8?

MR. DAVIS: Yes.

Q   (BY MR. DAVIS) Mr. Myers, we talked about the first section. Is that the order for the -- what we call "loading up a new truck," so to speak, that's all the gauge rings?

A   The gauge rings, yes, sir.

Q   Okay. And, again, you weren't putting a new truck into service around that time?

A   No, sir.

Q   What about the May, June, July, no new truck?

A   (Shakes head negatively).

Q   And what about the next section? What -- what are your concerns about the orders there?

# EXHIBIT 5

REPORTER'S RECORD
VOLUME 4 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 14-DCV-218252

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/2/2015 3:39:27 PM
CHRISTOPHER A. PRINE
Clerk

SCHLUMBERGER TECHNOLOGY ) IN THE DISTRICT COURT
CORPORATION )
)
)
VS. ) FORT BEND COUNTY, TEXAS
)
RICKY D. PARKER AND JAMES )
MYERS ) 268TH JUDICIAL DISTRICT

---

## TEMPORARY INJUNCTION HEARING

---

On December 8, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Brady G. Elliott, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

APPEARANCES

MR. W. JACKSON WISDOM
MR. JAMES "JIM" M. CLEARY
MARTIN DISIERE, JEFFERSON & WISDOM
808 TRAVIS, 20TH FLOOR
HOUSTON, TEXAS 77002
Telephone:  713.632.1700
Counsel for Defendants

MR. BILL DAVIS
MR. JEFF BARNES
JACKSON LEWIS, P.C.
1415 LOUISIANA, SUITE 3325
HOUSTON, TEXAS 77002
Telephone:  713.568.7860
Counsel for Plaintiff

patience with me. I have tried a few judges' patience in the past, and today was no exception. I am passionately committed to the idea that these men need to be able to make a living during the holidays, and I think my commitment is based solidly not just on moral principles but the law of Oklahoma, which should apply, or the law of Texas, if the Court chooses to apply. Thank you.

THE COURT: Counsel, if I sounded a little bit perturbed, we seemed to be covering the same ground, but when I asked you to be direct, you were, and I appreciate that.

Do you have a rejoinder?

MR. DAVIS: I'm sorry, your Honor?

THE COURT: Do you have a rejoinder?

FINAL STATEMENT

MR. DAVIS: Your Honor, just quickly on this -- the notion that there's no evidence that Mr. Parker -- or that the agreement didn't prohibit Mr. Parker from preparing to compete. The language of the agreement talks about performing work. And the evidence is work for Schlumberger would include ordering things, planning, preparing; and he was doing work for the new business. To the extent they're saying: Well, the new business didn't have its doors open yet, what he

was doing -- and I think the evidence shows this -- is he had an existing business, C.C.T.S., which Schlumberger was okay with, but he was doing some of this under C.C.T.S., quite naturally probably because some people may not want to deal with the startup and then dealing with the C.C.T.S. business.

THE COURT: What do you say, Counsel, as to the questions raised by the defense that the wording of the contract seems to avoid geographic limitations that the law imposes on non-compete agreements?

MR. DAVIS: Well, you've got two different types of restrictions. One is the customer restriction, which I think the law is clear. As long as it's limited to customers with whom they had dealings, that takes care of the geographic area. I think the law is clear on that. On a customer restriction, you don't need to say counties, states, United States.

THE COURT: Well, in that same vein, then, if I take your argument to its natural conclusion, Mr. Parker could solicit business from the next-door neighbor of the Schlumberger operation as long as they had not conducted business with Schlumberger?

MR. DAVIS: Correct.

THE COURT: I seem to look at that rather broad provision of the agreements as broader than that.

know, they have slickline business in other states, but we didn't offer testimony of that, nor are we asking that it go that far. It was focused on the Parker Energy Service business that was purchased that Mr. Parker continued to manage and then Mr. Myers managed after he left. That's why we limited the testimony to those states.

THE COURT: But you would agree that they could be -- that language would be interpreted to be broader than that?

MR. DAVIS: I don't believe No. 1 could because it talks about in which they had an assignment or customer. 2 is customers and assignments where they used intellectual property. And 3 talks about a manufacturing site, development site, but that's not an issue in this case.

And then 4, it appears to me it talks about the company's business in which employee was employed by the company, and then they viewed this business as the Parker Energy Services business, not the whole slickline business, so I just don't read it as broadly as they do.

THE COURT: Okay. Go ahead.

MR. DAVIS: I believe that's all I have.

THE COURT: The purpose of a temporary

injunction is to not resolve the final issues between the parties but to determine whether the -- who would be the prevailing party in the final lawsuit. In that regard, it's not my task here today to assign damages, to assign a particular dollar amount to any violations that may or may not be in the final analysis proved; it's simply to focus on the activities of Mr. Parker and his current company and Mr. Myers. Those are the two issues that have to be resolved.

In that regard, I'll start out with Mr. Myers. And, firstly, I will say that it's my decision that Texas law applies. The parties did business in Texas. Clearly Mr. Parker, by his application for the new company to do business in Texas, showed very clearly he was doing business in Texas; and as pointed out by the opinions of the Courts of Appeals and the Supreme Court, the oil and gas business is not confined to one state. It's not only multinational, it's multiglobal; and they take that in consideration in determining these particular conflicts that arise. In this regard, very specifically, the two agreements that I'm ruling on, the I.C.N. and the retention bonus agreement, specifically say the laws of Texas shall apply; and the activity was in Texas, so I find that Texas law applies.

In that regard as directed to Mr. Myers, it's clear he violated both the I.C.N. and retention bonus agreement; and with that finding, I issue a temporary injunction against him as to those issues; but in that temporary injunction order to be produced, it will be focused as the agreement reads, on the businesses in the areas in which Mr. Myers had responsibility.

And I point out, counsel, and I appreciate Mr. Myers is a unique manager; he likes to get his hands dirty; he likes to be out in the field. But he, by definition in the agreements, is an operating manager; and as such, he has responsibility for more than just the particular truck in the particular county or parish in which he's involved; therefore, the temporary injunction applies.

As to Mr. Parker, I think one cannot look at it with blindness and not ignore the fact that he spent time preparing to go in competition; but that is a matter to be decided in the final hearing as to when the date should apply; but, in fact, it does apply; and I'll issue a temporary injunction against Mr. Parker.

With that said, is there any other matter we need to take up at this time?

MR. CLEARY: Your Honor, we ask you stay

**3**

Filed
5/13/2015 3:49:03 PM
**Annie Rebecca Elliott**
District Clerk
Fort Bend County, Texas
Jennifer Melendez

CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| v. | § § | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, | § § § | |
| Defendants. | § | 268th JUDICIAL DISTRICT |

## PLAINTIFF'S RESPONSE TO DEFENDANT RICKY PARKER'S MOTON TO DISSOLVE THE TEMPORARY INJUNCTION

This Court granted a temporary injunction in favor of Plaintiff Schlumberger Technology Corp. ("Schlumberger") and against Defendants Ricky Parker and James Myers after a two-day hearing in December 2014. Parker's motion to dissolve the temporary injunction re-urges the same arguments that this Court rejected at the temporary injunction hearing. Because there are no intervening circumstances or developments that warrant a modification to the temporary injunction, Schlumberger respectfully requests that the Court deny the motion and leave the temporary injunction intact.

## A. Background

### 1. Parker signed the ICN Agreement

Parker owned and operated Parker Energy Services ("Parker Energy"), which provided wireline, slick line, and braided line services to operators in the oilfield. Parker sold his company to Schlumberger for $17,000,000 in September 2011. In connection with the sale of Parker Energy and as part of transitioning his employment to Schlumberger, Parker signed the Intellectual Property, Confidential Information, and Non-Compete Agreement ("ICN Agreement"). (Ex. A.)

Page 1

By signing the ICN Agreement, Parker promised that, for one-year after the termination of his employment, he would not:

- Solicit, recruit, or hire Schlumberger employees; or

- Work for a competitor in the same business segment in which they worked for Schlumberger (*i.e.*, wireline, slick line, and braided line).

(*Id.* ¶ 5, 13.) Parker agreed that, if he breached the non-compete covenant, the one-year period would be extended by the period when he was in breach. (*Id.* ¶ 7.)

## 2. Parker breached the ICN Agreement beginning in December 2013 or January 2014

Parker resigned from Schlumberger in October 2013. He formed Professional Wireline ("PWL"), a wireline, slick line, and braided line business. Parker ordered six wireline trucks for PWL in December 2013 or January 2014 at a cost of over $2 million. (Ex. B, 3 R.R. 46.) At his deposition, Parker refused to answer whether he also ordered several hundred thousand dollars of tools in April 2014, though he admitted sending the vendor an email titled "Top Secret" during that time because he did not want Schlumberger to know that he was building tools for PWL. (*Id.*, 3 R.R. 46-47.)

Parker involved Myers in PWL's business activities while Myers was still working for Schlumberger. Prior to Myers' resignation from Schlumberger, he worked with Parker to procure and test equipment and tools, and helped Parker put Master Service Agreements in place with customers. (*Id.*, 3 R.R. 35, 41, 103.) As early as April 2014, Myers also ordered expensive tools for PWL on Schlumberger's dime. (*Id.*, 3 R.R. 106-09.) Myers ordered equipment for a new truck in April 2014, even though Schlumberger did not put any new trucks into service in April 2014 or during the following months, and had no use for the

equipment that Myers ordered. (*Id.*, 3 R.R. 108-09, 112.) Moreover, Schlumberger has been unable to locate the equipment Myers ordered. (*Id.*, 3 R.R. 106-09.)

### 3. Parker and Myers blitzed Schlumberger's employees and customers

Myers "retired" from Schlumberger at about 6:00 p.m. September 16, 2014. (*Id.*, 3 R.R. 60; 5 R.R. Ex. 17.) Only thirty minutes after his resignation, Myers held a "party" at his home. (*Id.*, 3 R.R. 59-60.) The only attendees at this "party" were four Schlumberger employees who had reported to Myers, and their wives. (*Id.*, 3 R.R. 61.) Myers told the Schlumberger employees he was going to work PWL (despite having "all intentions of retiring" just thirty minutes earlier) and instructed them to visit with Parker about a job at PWL. (*Id.*, 3 R.R. 60-62.)

Nine Schlumberger employees who had reported to Myers resigned on September 17, 2014, and another employee resigned on September 18, 2014. (*Id.*, 2 R.R. 36-37; 3 R.R. 84; 5 R.R. Ex. 9.) All of the employees who resigned immediately joined PWL without any notice to Schlumberger, which left Schlumberger without the personnel to cover jobs. (*Id.*, 2 R.R. 37; 3 R.R. 99.) In total, in just twenty-four hours after Myers' resignation, PWL poached about half of the workforce that Schlumberger had entrusted to Parker and Myers before their resignations. (*Id.*, 2 R.R. 37; 5 R.R. Ex. 9.)

In depositions before the temporary injunction hearing, Schlumberger asked Parker and Myers if they offered cash bonuses as an incentive for employees to resign from Schlumberger with no notice. Parker and Myers both denied paying any sign-on bonuses in their depositions. (Ex. C, Parker Dep. at 20-26-27; Ex. D, Myers Dep. at 77-78, 83.) Months after their depositions and the temporary injunction, however, Parker and Myers returned errata sheets completely changing this testimony and admitting that sign-on bonuses were in fact paid. (Ex. E,

Parker Errata Sheet; Ex. F, Myers Errata Sheet.) Parker and Myers clearly provided false testimony at their depositions before the temporary injunction hearing.

PWL blitzed the same customers that Parker and Myers dealt with at Schlumberger. (*Id.*, 2 R.R. 56; 3 R.R. 66-70.) Parker solicited Linn Energy, Unit Petroleum, and XTO, all prior to September 23, 2014. (*Id.*, 3 R.R. 32-33.) PWL was already signing up to do business with XTO, Linn Energy, and Unit Petroleum just seven days after Myers' resignation. (*Id.*, 3 R.R. 33.) Within ten days of Myers' resignation, PWL performed a job for XTO. (*Id.*, 3 R.R. 36.) Prior to this Court's entry of the TRO (still just a few weeks after Myers' resignation), PWL had already performed jobs for XTO, Linn Energy, and Unit Petroleum—all Schlumberger customers Parker solicited during his non-compete term and with whom Parker and Myers dealt during their employment with Schlumberger. (*Id.*, 3 R.R. 66, 115; 5 R.R. Ex. 13.)

At the temporary injunction hearing, the evidence showed that Parker continued to operate PWL in violation of the TRO. (*Id.*, 4 R.R. 104.) Additionally, following the entry of the TRO, Parker obtained the phone Myers used at Schlumberger and gave it to another PWL employee, so PWL could get business if a Schlumberger customer called Myers. (*Id.*, 3 R.R. 39, 59.).

## B. This Court already rejected Parker's argument that he has "served his time"

There was no dispute at the temporary injunction hearing that Parker breached the non-compete provision in his ICN Agreement. In fact, Parker admitted that he breached his ICN Agreement by operating a competing wireline, slick line, and braided line business, and by hiring Schlumberger employees. (*Id.*, 3 R.R. 32, 41-43.) But the parties disagreed on how early the breach occurred and, therefore, disputed how long the non-compete restriction should be extended under Paragraph 7 of the ICN Agreement.

Parker claimed at the temporary injunction hearing, as he does now in his motion to modify the temporary injunction, that the breach occurred at the earliest on September 17, 2014 and therefore the non-compete restriction should only have been extended a few weeks. The Court rejected this argument, instead giving weight to the evidence that Parker breached the non-compete provision beginning in December 2013 or January 2014, when Parker created PWL and ordered six wireline trucks for PWL at a cost of over $2 million. (*Id.*, 3 R.R. 46.)

Since Parker began breaching the ICN Agreement in December 2013 or January 2014, with about nine months remaining on the one-year period, Paragraph 7 of the ICN Agreement required the non-compete restriction to be extended about nine months. Further, because the evidence at the temporary injunction hearing demonstrated that Parker continued to operate PWL in violation of the TRO, the time between the TRO and temporary injunction hearing should not be credited as "time served" on the nine-month extension. Accordingly, Schlumberger is entitled to a temporary injunction continuing until the earlier of a trial on the merits or September 18, 2016 (nine months after the temporary injunction). Dissolving the temporary injunction at this stage would not give Schlumberger the benefit of a one-year non-compete period to which it is entitled.

## C. The ICN Agreement did not permit Parker to "prepare to compete"

Parker relies on *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503 (Tex. App.-Houston [1st Dist.] 2003, no pet.) for the proposition that he was permitted to "prepare to compete" during the one-year period of the ICN Agreement. The *Abetter Trucking* decision, however, only addressed whether Texas *common law* prohibits an employee from preparing to compete with his employer during an employment relationship; the employee in *Abetter Trucker* did not have a non-compete agreement like Parker. 113 S.W.3d 503, 510 (Tex. App.-Houston

[1st Dist.] 2003, no pet.). The "preparing to compete" common law principles upon which Parker relies do not apply when the employee and his employer have entered a restrictive covenant agreement. *Ameripath, Inc. v. Hebert*, 447 S.W.3d 319, 341 n.22 (Tex. App.-Dallas 2014, pet. filed) (rejecting employee's argument that *Abetter Trucking* applies to non-compete contract cases). Indeed, *Abetter Trucking* expressly stated that an employer who wished to restrict an employee's competitive activities beyond what the common law prohibited "may seek to accomplish that goal through a non-competition agreement." 113 S.W.3d at 510.

By signing the ICN Agreement, Parker agreed that he would not "directly or indirectly work for or assist . . . any business or commercial operation . . . in direct or indirect competition with any area of the Company's business in which Employee was employed by Company." (Ex. A ¶ 5.) Parker re-urges the argument he made at the temporary injunction hearing, namely that PWL was not in direct or indirect competition with Schlumberger until it attempted to solicit business from customers. This Court properly rejected this narrow view of "competition" at the temporary injunction hearing. While soliciting business from customers may be a final and ultimate step of competing, actions like buying wireline trucks and equipment and soliciting key wireline employees are activities that are designed to secure business from customers and are, therefore, acts of competition. Because Parker's activities beginning in December 2013 or January 2014 violated his non-compete obligations, the Court's temporary injunction properly extended the one-year term as required by Paragraph 7 of the ICN Agreement.

## D. Parker's failure to comply with the injunction is grounds for denying the motion

There are a number of outstanding discovery issues relating to Parker's compliance with the temporary injunction to date. The competing business—that Parker

owned—continued to operate for a time after both Myers and Parker claimed they had resigned. Parker tried to mask his involvement with PWL by placing his ownership interest in a family trust, and then claiming in discovery that he had no access to any PWL documents, including his own emails.

With respect to the return of property and information required by paragraphs 1 through 4 of the temporary injunction, Parker has played a shell game with respect to who has the ability to make the return. Parker claims that since he no longer works for PWL, Schlumberger should look to PWL. When Schlumberger looked to PWL, it states that it thought Parker had made the return.

Further, while claiming the business is shut down, another competitor has appeared in the geographic area where PWL was operating. PWL equipment has appeared at that competitor's operations and some of the former Schlumberger employees are now working there. Schlumberger needs additional discovery relating to any involvement by Parker. As the evidence in this case clearly shows, Parker did not comply with ICN Agreement he signed. He did not comply with his duty to provide truthful testimony at his deposition. Discovery will likely reveal that he also failed to comply with the restrictions in the temporary injunction.

For the foregoing reasons, Schlumberger respectfully requests that the Court deny Parker's motion to modify the temporary injunction.

Respectfully submitted,

/s/ Jeff Barnes
Jeff Barnes
State Bar No. 24045452
barnesj@jacksonlewis.com
JACKSON LEWIS P.C.
1415 Louisiana, Suite 3325
Houston, Texas 77002-7332
PH: (713) 650-0404
FX: (713) 650-0405
and
William L. Davis, Esq.
State Bar No. 05563800
davisw@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH: (214) 520-2400
FX: (214) 520-2008

**ATTORNEYS FOR PLAINTIFF**
**SCHLUMBERGER TECHNOLOGY**
**CORPORATION**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was forwarded via facsimile on May 13, 2015, to the following attorneys of record:

W. Jackson Wisdom, Esq.
Martin, Disiere, Jefferson & Wisdom, LLP
808 Travis, Suite 1800
Houston, Texas 77002

/s/ Jeff Barnes
Jeff Barnes

### INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION, AND NON-COMPETE AGREEMENT

THIS AGREEMENT is made by and between Schlumberger Technology Corporation, a Texas corporation acting for itself and on behalf of its Affiliates as more fully defined below (hereinafter collectively referred to as "Company") and ___Kick Drker___ (hereinafter referred to as "Employee"), and shall be effective as of the __L 0__ day of __Sept.__, 20_11_.

In consideration of the Company's employment of Employee, the Company's promise to provide Employee with Company Intellectual Property, as defined in Paragraph 5 below, the Company providing Employee with Company Intellectual Property, or the Company providing Employee with access to Company Intellectual Property, the payment of a salary or other remuneration, and other consideration, the Parties agree as follows:

1. Definitions.

   1.1. "Intellectual Property" is all patents, trademarks, copyrights, trade secrets, Company Confidential Information, new or useful arts, ideas, discoveries, inventions, improvements, software, business information, lists, information considered by Company to be confidential, designs, drawings, writings, contributions, works of authorship, findings or improvements, formulae, processes, product development, manufacturing techniques, business methods, tools, routines and methodology, documentation, systems, enhancements or modifications thereto, know-how, and developments, any derivative works and ideas whether or not patentable, and any other form of intellectual property.

   1.2. "Company Intellectual Property" is all Intellectual Property, that was authored, conceived, developed, or reduced to practice by Employee (either solely or jointly with others) during the term of his/her employment. Company Intellectual Property may be originated or conceived during the term of Employee's employment but completed or reduced to practice thereafter. Company Intellectual Property shall be deemed a "work made for hire" as that term is defined by the copyright laws of the United States. Company Intellectual Property also includes any "Pre-existing Intellectual Property" assigned, licensed, or transferred to Company, and any "Pre-existing Intellectual Property" in which Company has a vested or executory interest.

   1.3. "Pre-existing Intellectual Property" is all Intellectual Property that were authored, conceived, developed, or reduced to practice by Employee before the term of Employee's employment with the Company began.

   1.4. "Company Confidential Information" includes technical information, software, databases, methods, know-how, formulae, compositions, drawings, designs, data, prototypes, processes, discoveries, machines, inventions, well logs or other data, equipment, drawings, notes reports, manuals, business information, compensation data, clients lists, client preferences, client needs, client designs, financial information, credit information, pricing information, information relating to future plans, marketing strategies, new product research, pending projects and proposals, proprietary design processes, research and development strategies, information relating to employees, consultants and independent contractors including information relating to salaries, compensation, contracts, benefits, inceptive plans, positions, duties, qualifications, project knowledge, other valuable confidential information, trade secrets, patent applications, and related filings regardless of whether or not identified as confidential or proprietary, and similar items.

   1.5. "Affiliate" means any entity which now or in the future directly or indirectly controls, is



controlled by, or is under common control with Company, where "control" in relation to a company means the direct or indirect ownership of at least fifty-percent of the voting securities or shares.

2. Employee agrees to promptly disclose in writing to Company all Company Intellectual Property. Company Intellectual Property shall remain the exclusive property of Company whether or not deemed to be a "work made for hire" within the meaning of the copyright laws of the United States.

Any and all rights, title, and ownership interests, including copyright, that Employee may have in or to Company Intellectual Property or any tangible media embodying such Company Intellectual Property, as well as any U.S. and international applications for patent or copyright registrations thereon during and subsequent to his/her employment are hereby assigned to Company, and Company shall have the royalty-free right to use such existing Company Intellectual Property without any further agreement between Company and Employee. Employee, however, does not assign or agree to assign to Company any Pre-existing Intellectual Property.

During and after employment with Company, Employee shall assist Company in obtaining patents, copyrights, and other indicia of ownership, protection for such inventions and copyrightable materials, including completing and executing any necessary documents, contracts, or agreements, with respect to all such Company Intellectual Property which Company shall, in its sole discretion, determine to obtain.

Employee shall disclose to Company Employee's complete written record of any Company Intellectual Property, including any patent applications, correspondence with patent agents and patent offices, research, written descriptions of the technology, test data, market data, notes, and any other information relating to Company Intellectual Property. Employee shall also identify all co-inventors, co-authors, co-composers, partners, joint venturers, assistants, or other people to whom the Company Intellectual Property was disclosed in whole or in part, who participated in developing the Company Intellectual Property, or who claim an interest in the Company Intellectual Property. Employee's disclosure shall conform to the policies and procedures in place at the time governing such disclosures.

Employee shall not destroy, modify, alter, or secret any document, tangible thing, or information relating to Company Intellectual Property or Company Intellectual Property except as occurs in the ordinary performance of Employee's employment.

3. Except as required in performing Employee's duties for the Company, Employee will not remove from Company's facilities any Company Confidential Information including but not limited to equipment, drawings, notes, reports, manuals, invention records, software, customer information, well logs or other data, or other material, whether produced by Employee or obtained from Company. This includes copying or transmitting such information via Personal Digital Assistants, mobile phones, external hard drives, USB "flash" drives, USB storage devices, FireWire storage devices, floppy discs, CD's, DVD's, personal email accounts (including web-based email accounts such as Hotmail, Gmail, Yahoo), memory cards, Zip discs, and all other similar media which can be used to transmit electronic data.

4. Employee agrees to deliver all such Company Confidential Information and materials to Company immediately upon request, and in any event upon termination of employment. If any such Company Confidential Information has been stored on any personal electronic data storage device, including a home or personal computer, Employee agrees to make available the device to the Company for removal and/or copying of the information. Employee will not publish or disclose or transfer to any person, other than in the proper performance of Employee's duties for the Company, or use in any way other than in Company's business, any trade secrets or confidential technical or business

information or material of Company—including Company Intellectual Property and Company Confidential Information, either during or after employment with Company.

5. Upon the signing of this Agreement, or reasonably soon thereafter, and in any event prior to the termination of Employee's employment, the Company will provide Employee and Employee will receive access to Company Confidential Information which is proprietary, confidential, valuable, and relates to Company's business.

Employee recognizes and acknowledges that Company Confidential Information, both tangibly recorded or memorized, constitutes valuable trade secrets belonging to Company. In order to protect Company against any unauthorized use or disclosure of Company Confidential Information, and in exchange for the Company's promise to provide Employee with access to Company Confidential Information and other consideration prior to the termination of his/her employment, Employee agrees that for a period of one (1) year following the date of termination of his/her employment with Company, Employee will not directly or indirectly work for or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company. Moreover, Employee agrees that Company may provide a copy of this Agreement to any entity for whom Employee provides services in the one (1) year period following the date of termination of Employee's employment with Company.

Employee recognizes and acknowledges that the Company's business, research and products are by nature worldwide in scope, and that the Company is not required to maintain a physical location in close proximity to its customers. Employee agrees that in order to protect Company Confidential Information, business interests and goodwill, the foregoing restriction on Employee's subsequent employment shall extend to any county, parish, borough, or foreign equivalent: (1) in which Employee had a customer or service assignment for Company in the one-year period preceding Employee's termination; (2) in which Company has customers or service assignments about which Employee obtained Company Intellectual Property during his/her employment with Company; (3) in which Company has a manufacturing site, development site, work site, job site, or offices; and/or (4) in which any business or commercial operation whose business (a) is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company or (b) has a manufacturing site, development site, work site, job site, or offices.

Employee shall comply with all Company's policies and codes of ethics as it may promulgate from time to time, including those related to intellectual property, confidential information, Company Confidential Information, and Company Intellectual Property. Nothing in those policies shall be deemed to modify, reduce, or waive Employee's obligations herein and in the event of any conflict or ambiguity, this Agreement prevails.

6. The obligations in the foregoing section do not apply to Employee if Employee is a lawyer licensed to practice law in any state in the United States and whose employment for the Company involves the practice of law where such duties in this Agreement would abrogate, modify, or contradict any applicable rules of professional conduct, codes of ethics, or professional responsibility obligations. However, to the maximum extent possible all duties in this Agreement—including duties of non-disclosure and confidentiality—shall be applicable to such lawyers to the extent they do not abrogate, modify, or contradict any applicable rules of professional conduct, codes of ethics, or professional responsibility obligations.

7. If Employee is found to have breached any promise made in Paragraph 5 of this Agreement, the one-year period specified in Paragraph 5 shall be extended by the period of time for which Employee was in breach so that Company has the full benefit of the one-year periods specified in Paragraph 5.

8. Employee acknowledges that Company has agreed to provide Employee with Company Confidential Information during Employee's employment with Company. Employee further acknowledges that, if Employee was to leave the employ of Company for any reason and use or disclose, directly or indirectly, Company Confidential Information, that such use and/or disclosure would cause Company irreparable harm and injury for which no adequate remedy at law exists. Therefore, in the event of the breach or threatened breach of the provisions of this Agreement by Employee, Company shall be entitled to obtain injunctive relief to enjoin such breach or threatened breach, in addition to all other remedies and alternatives which may be available at law or in equity. Employee acknowledges that the remedies contained in the Agreement for violation of this Agreement are not the exclusive remedies which Company may pursue.

9. Company has attempted to place the most reasonable limitations on Employee's subsequent employment opportunities consistent with the protection of Company's valuable trade secrets, Company Confidential Information, business interests, and goodwill. Employee acknowledges that the limitations contained herein, especially limitations as to time, scope, and geography, are reasonable. In order to accommodate Employee in obtaining subsequent employment, Company may, in its discretion, grant a waiver of one or more of the restrictions on subsequent employment contained in Paragraph 5. A request for a waiver shall be in writing and must be received by Company at least forty-five (45) days before the proposed starting date of the employment for which Employee is seeking a waiver. The request must include the full name and address of the organization with which Employee is seeking employment; the department or area in which Employee proposes to work; the position or job title to be held by Employee; and a complete description of the duties Employee expects to perform for such employer. If Company decides to grant a waiver (which shall be solely in Company's discretion), the waiver may be subject to such restrictions or conditions as Company may impose and shall not constitute a waiver of any other term.

10. Any waiver of any term of this Agreement by Company shall not operate as a waiver of any other term of this Agreement, nor shall any failure to enforce any provision of this Agreement operate as a waiver of Company's right to enforce any other provision of this Agreement.

11. Company does not wish to receive from Employee any confidential or proprietary information of a third party to whom Employee owes an obligation of confidence. Accordingly, Employee represents and warrants that any information Employee either discloses to Company or uses while employed by Company is not subject to any obligation of confidentiality to any former employer or other third party. Employee acknowledges that his or her performance of this Agreement and his or her duties as an employee of Company do not and will not breach any agreement to keep in confidence proprietary information, knowledge, or data acquired by Employee prior to Employee's employment with Company.

12. Employee is not a party to any other agreement that will interfere with Employee's full compliance with this Agreement or that otherwise may restrict Employee's employment by Company or the performance of Employee's duties for Company. Employee agrees not to enter into any agreement, whether oral or written, in conflict with this Agreement.

13. Employee agrees that while employed by Company, and during the one-year period following the termination of his/her employment, Employee will neither directly nor indirectly, on his/her own behalf or on behalf of any person or entity, in any capacity, recruit, hire, solicit, or assist others in recruiting, hiring, soliciting any person, who is, or was, during the period of Employee's employment with Company, an employee or consultant of Company.

14. This Agreement may be enforced by, shall inure to the benefit of, and be binding upon Company, its successors, and assigns. This Agreement is binding upon Employee's heirs and legal representatives. By accepting a transfer to an Affiliate of Company, Employee agrees to the automatic assignment of

this Agreement to said Affiliate contemporaneously with the acceptance of such transfer, subject to subsequent agreements executed by Employee and Affiliate of Company or Company, and to the fullest extent allowed by law.

15. By accepting a transfer to an Affiliate of Company, Employee agrees to the automatic application of all of the terms of this Agreement to said Affiliate contemporaneously with the acceptance of such transfer, subject to subsequent agreements executed by Employee and Affiliate of Company or Company, and to the fullest extent allowed by law.

16. This Agreement or any part thereof may be modified, superseded, waived, or amended only in writing signed by an authorized representative of Company and by Employee. Any appendices to this Agreement are part of this Agreement as if wholly incorporated herein.

17. Because Employee may work in various locations and to eliminate potential uncertainty over the governing law, this Agreement shall be interpreted and construed exclusively in accordance with the laws of the State of Texas. Venue for any dispute(s) arising from or related to this Agreement shall lie solely, and is convenient, in Fort Bend County, Texas. Employee consents to the choice of law and venue provisions of this Agreement and agrees that Employee will not contest these provisions in any future proceeding(s). Employee agrees that Texas, as Company's United States Headquarters, has a greater legal interest in matters relating to this Agreement than any other state, has a greater public policy interest in matters relating to this Agreement than any other state, and has a greater factual relationship to matters relating to this Agreement than any other state.

18. Should any portion of this Agreement be held judicially invalid, unenforceable, or void, such holding will not have the effect of invalidating or voiding the other portions of this Agreement not so declared or any part thereof, the parties hereby agreeing that the portion so held to be invalid, unenforceable, or void shall be deemed amended, reduced in scope or deleted to the extent required to be valid and enforceable in the jurisdiction of such holding. The parties agree that, upon a judicial finding of invalidity, unenforceability, or voidability, the court so finding may reform the agreement to the extent necessary for enforceability, and enter an order enforcing the reformed Agreement. No court ordered reformation or amendment shall give rise to a finding of knowing, willfulness, or bad faith unreasonableness against Company regarding this Agreement.

19. This Agreement and Appendix contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes any previous understandings or agreements, whether written or oral, in respect of such subject matter.

| SCHLUMBERGER TECHNOLOGY CORPORATION | I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THIS AGREEMENT, AND THAT I AGREE TO ABIDE BY ITS TERMS. |
|---|---|
| Signed: _Willie S._ | EMPLOYEE |
| Printed Name: _Debbie Silins_ | Signed: _Ricky_ |
| Title: _HR Rep_ | Printed Name: _Ricky Parker_ |
| Date: _9/10/11_ | Date: _9/10/11_ |

REPORTER'S RECORD
VOLUME 2 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 14-DCV-218252

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/2/2015 3:39:27 PM
CHRISTOPHER A. PRINE
Clerk

SCHLUMBERGER TECHNOLOGY        ) IN THE DISTRICT COURT
CORPORATION                    )
                               )
VS.                            ) FORT BEND COUNTY, TEXAS
                               )
RICKY D. PARKER AND JAMES      )
MYERS                          ) 268TH JUDICIAL DISTRICT

---

**TEMPORARY INJUNCTION HEARING**

December 5, 2014 - Morning Session

---

On December 5, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Brady G. Elliott, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.



EXHIBIT
B
tabbies

was -- I'm sorry. I thought it was produced by defendants, but I may be mistaken.

Q (BY MR. DAVIS) Are you familiar with the -- Daniel Harrison?

A Daniel Harrison, I'm very familiar with.

Q Okay. Who is he?

A Daniel Harrison was one of our field specialists operating for James Myers.

Q So he reported directly to Mr. Myers?

A Yes.

Q And did he manage people?

A He would have managed the helpers that work for him.

Q Okay.

MR. DAVIS: And, your Honor, we'll offer Plaintiff's Exhibit 16.

MR. CLEARY: Your Honor, they still haven't met the predicate. There's been no testimony that this witness is a custodian of records, so there's no testimony that this witness has any personal knowledge of this document. He's not an author. He's not a recipient. He's still simply spouting hearsay and hasn't met the requirements.

THE COURT: Sustained.

Q (BY MR. DAVIS) Mr. Billingham, when did

Mr. Harrison resign from Schlumberger?

A    September 17th is the date.

Q    What time of day?

A    3:50 in the morning.

Q    Okay.  So September 16 at 6:00 p.m., Mr. Myers tenders his resignation, and September 17 at 3:51 a.m., Daniel Harrison, who reports to Mr. Myers, tenders his resignation?

A    That is correct.

Q    How many other resignations did you receive that day?

A    I cannot remember the exact number.

Q    Okay.

A    I believe it was around 11.

Q    Did that strike you as odd?

A    Absolutely.  That was half of our workforce.

Q    Half of the workforce in Oklahoma?

A    Yes.

Q    Where did they go to work?

A    They went to work for Professional Wireline Services.

Q    And as of September 17, where was Mr. Myers working?

A    Professional Wireline Services.

Q    Have you ever seen anything like this, all of

A    We've got one occasion where I know that a client called up for work and --

MR. CLEARY:  I'm going to object as hearsay, your Honor.  He's referring to a conversation between some unidentified person at Schlumberger and a client.

THE COURT:  I haven't really heard enough of the response to be able to understand the objection or whether it applies or not.

Counsel, probably, you could ask a little better question.

Q    (BY MR. DAVIS) Okay.  Well, let's -- let's just focus on Paragraph A and Mr. Myers trying to solicit, contact, or accept work that is the same or substantially similar to the work he performed for Schlumberger.  Do you believe he has done that?

A    By going to Professional Wireline, he couldn't have done work that was more similar.  It's exactly the same type of work.

Q    Okay.  And has he -- has Professional Wireline taken business away from Schlumberger?

A    Yes.

Q    The same customers that he dealt with?

A    Yes.

Q    At Schlumberger?

REPORTER'S RECORD
VOLUME 3 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 14-DCV-218252

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/2/2015 3:39:27 PM
CHRISTOPHER A. PRINE
Clerk

SCHLUMBERGER TECHNOLOGY ) IN THE DISTRICT COURT
CORPORATION )
)
vs. ) FORT BEND COUNTY, TEXAS
)
RICKY D. PARKER AND JAMES )
MYERS ) 268TH JUDICIAL DISTRICT

---

**TEMPORARY INJUNCTION HEARING**

December 5, 2014 - Afternoon Session

---

On December 5, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Brady G. Elliott, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

So you thought it was okay on the 17th --

THE COURT REPORTER: Was this a question?

MR. DAVIS: I'm sorry.

Yes, a question.

"Q: So you thought it was okay on the 17th to start hiring Schlumberger employees, right?

"A: I thought it was okay to compete.

"Q: Okay. And you had forgotten about the other agreement you signed, which was the -- it's Exhibit 1, the intellectual property, confidential information, and non-compete agreement? Is that a fair statement?

"A: I -- I guess.

"Q: Okay. You agree that before October 2, 2014, you started working for a business which competes with Schlumberger, right?

"A: Before when?

"Q: October 2, 2014.

"A: Yes."

MR. DAVIS: Moving to Page 30, Line 11:

"Q: Well, you were working on -- we know you were working on getting a master service agreement in place with --

"A: Yes.

"Q: Linn, Unit, B.P. and X.T.O. as of

September 23rd, 2014, right? We see that from the exchange of text messages.

"A: Yes. I was working with the people in the clerical -- in the office on M.S.A.'s.

"Q: Right. It was Mr. Myers -- and it was Mr. Myers who went out to the customers to talk with them about doing work for them at the new company. He said he did -- had a bunch of meetings on September 17th and several days after that, right?

"A: Hmm, and I know Jason met with him.

"Q: Daniel Harrison went on a couple, right?

"A: I guess."

MR. DAVIS: Moving back to Page 9, Line 5:

"Q: Okay. So as of September 23rd, just six days after, we'll give it seven days after Mr. Myers left Schlumberger, you-all are already signing up to do business with X.T.O., Linn Energy, Unit Petroleum, and you're rattling B.P.'s cage, right?

"A: We're working on it, yes."

MR. DAVIS: Moving to Page -- to Line 19 on Page 9:

"Q: You are running an operation there at Schlumberger, your last year there, and the operation did business with all of those customers, right?

"Q: What were you signing?

"A: Honestly, I don't remember on that text.

"Q: Did it relate to P.W.L. business?

"A: I don't know. I don't remember."

MR. DAVIS: Moving to Page 7, Line 5:

"Q: Page 3, we have a text September 13, 2014 from you to Mr. Myers that says -- quote -- 'Testing,' and it's 'L.U.B.', which I understand is lubricator -- dash, quote -- 'Wednesday'?

"A: Uh-huh.

"Q: Is that what you were talking about, testing a lubricator?

"A: That's correct.

"Q: And that's for the P.W.L. business, right?

"A: I believe it was."

MR. DAVIS: Moving down to Page -- to Line 25 of Page 7:

"Q: Well, so we've got three texts while Mr. Myers was still employed by Schlumberger where you're texting him about what's going on?

"A: What I'm doing.

"Q: At the P.W.L. competing business, right?

"A: It wasn't a competing business yet.

"Q: But it competes right now?

"A: It does now."

MR. DAVIS: Moving on to Page 13, Line 1:

"Q: And the last page of Exhibit 5 -- 65 is a text from Jimmy to you on September 26th, 2014, which says: 'Monday morning swab and amp.' Is that what it says?

"A: 'Monday morning swab and make a broach run on two- and three-eights something tubing, first confirmed job, X.T.O., Ardmore.'

"Q: So what does that tell you?

"A: That was the first job we're going to do.

"Q: So within ten days after Mr. Myers resigns from Schlumberger you-all have a job with X.T.O., right?

"A: Correct.

"Q: And then the next text is redacted. We don't know what that says, but the last one on this page is September 26th, 2014, from you to Mr. Myers. It says: 'Did you ever send me the price list again?'

"A: Again, uh-huh.

"Q: What price list are you talking about?

sent me personal e-mails there and that I think that was about it."

MR. CLEARY:  That's -- That's the end.

MR. DAVIS:  Moving to Page 41, Line 12:

"Q:  Who has possession of the phone now?

"A:  Jeff Billings.

"Q:  Who decide -- did you decide to give it to him?

"A:  Yes.

"Q:  Why?

"A:  Because I didn't want to carry two phones.

"Q:  Well, is one of the reasons you gave it to him is customers who have Mr. Myers' phone number might call and then Jeff Billings can answer and take the call?

"A:  Part of it.

"Q:  Well, Mr. Billings has his own phone, right?

"A:  Correct.

"Q:  Other than taking care of business for Mr. Myers from customers who might call, why would you need to give Mr. Billings Mr. Myers' phone?

"A:  I took the phone from Jimmy so he wouldn't be talking to anybody.

to signing it, did you?

"A:   No.

"Q:   But it's your position now that you shouldn't have to abide by it, right?"

MR. DAVIS:   And then Mr. Cleary objected.

MR. CLEARY:   I'll withdraw the objection.

"A:   No, I never read it.

"Q:   So you can't point to anything in there that you think is unreasonable?"

MR. DAVIS:   There's an objection.

MR. CLEARY:   Yeah, it's a legal conclusion.

THE COURT:   Overruled.

"A:   I don't know.  I haven't read it."

MR. DAVIS:   And moving down to Page 44, Line 9:

"Q:   Let's go through the calendar here. We've got October 2, 2013 is your best recollection of when you resigned from Schlumberger, right?

"A:   Correct.

"Q:   And we know that on September 17, which is within one year, you were hiring employees of Schlumberger to work for your new business, right?

"A:   Uh-huh.

"Q:   And yes?  You need to answer yes or

no.

"A:  Yes.

"Q:  And we need -- and we know from the text messages that you were in the process of getting M.S.A.'s from four customers as of September 23rd, right?

"A:  Yes.

"Q:  That's within the one-year period, correct?

"A:  Yes.

"Q:  So there's -- so there's no question that you didn't comply with that provision, is there?

"A:  The way it's written, I guess I didn't.

"Q:  And we know that if you look at Paragraph 13 on the next page, it says:  'During the one-year period following the termination of employment, you won't directly or indirectly recruit, hire, solicit, or assist others in recruiting, hiring, or soliciting any of Schlumberger's employees.'  You see that?

"A:  Yes.

"Q:  And you did that, right?

"A:  I did hire.

"Q:  So we know you didn't comply with that either, correct?

"A: That's correct.

"Q: But it's your position, even though that -- even though that you signed this as part of the asset purchase agreement, that it's unreasonable or that you shouldn't have had to comply with that?"

MR. DAVIS: And there's an objection.

MR. CLEARY: Yeah, he's asking him to give a legal conclusion as to whether or not the agreement is enforceable.

THE COURT: Overruled.

"A: I did not know this was part of the asset purchase.

"Q: Well, you know you signed it on September, 10, 2011, right?

"A: Uh-huh.

"Q: And you didn't object to signing it, did you?

"A: No. Some of the guys did.

"Q: Well, we'll talk about that in a second.

"You didn't -- Before you were paid 17 million as part of the asset sale, you didn't raise your hand and say -- quote -- 'Wait a minute, that wasn't part of the deal, I'm not signing this,' did you?

"A: No."

"Q:   The trucks, the wireline trucks that were ordered, that was from Gulf Coast Manufacturing in Louisiana; is that correct?

"A:   Yes.

"Q:   And when did you order those?  Let's talk about when you ordered the first one.  Was it about December of 2013?

"A:   Or January.  I don't remember.

"Q:   January of 2014?

"A:   Uh-huh.  I don't remember.

"Q:   Is that the same manufacturer that builds trucks for Schlumberger?

"A:   I guess they build some of them."

MR. DAVIS:  Moving on to Page 58, Line 2.

"Q:   Okay.  You ordered six trucks at about $340,000 a piece?"

"A:   Uh-huh."

MR. DAVIS:  On Page 61, Line 17:

"Q:   Did you order several hundred thousand dollars' worth of tools beginning in April of 2014 for P.W.L.?"

MR. DAVIS:  Mr. Cleary instructed the witness not to answer the question.

"Q:   And you're following your attorney's advice?

"A: Yes."

MR. DAVIS: Page 6:

"Q: Okay. Who did you deal with at B&T?

"A: Russell, and I believe it was Randy English.

"Q: Do you recall titling one of your e-mails in this order, quote, 'Top secret'?

"A: Yes.

"Q: Why did you call it 'Top secret'?

"A: Because I didn't want it out that I was building tools.

"Q: Because you knew Schlumberger would have concerns about that, right?"

MR. DAVIS: And there's an objection.

MR. CLEARY: I'll withdraw it.

"A: I don't know.

"Q: Did you talk to anyone at B&T about their keeping this quiet and not telling Schlumberger?

"A: I told them I didn't want anybody to know I was building tools."

MR. DAVIS: Moving on to Page 63, Line 22:

"Q: It looks like you've got your insurance from Upstream Brokers --

MR. CLEARY: I'm sorry. Let me jump in. Before we leave that last part, under

phone?

"A: Yes, sir.

"Q: And when did you give that to him?

"A: Before the T.R.O. I don't remember the exact date.

"Q: And why did you do that?

"A: Because some customers call it.

"Q: Okay. And that was the same phone you used while working for Schlumberger?

"A: Yes, sir."

MR. BARNES: Page 73, Line 1:

"Q: Was there a meeting at someone's house with some Schlumberger employees around September 16 or 17?

"A: There was a dinner.

"Q: Where?

"A: At my home.

"Q: Okay. And what time of day?

"A: Just the evening.

"Q: Of September 16?

"A: Yes, sir.

"Q: And who was invited to that dinner?

"A: Can you be more specific?

"Q: Well, who was present at the dinner?

"A: Daniel Harrison and his wife, Sandy,

Brian Cook and his wife, Cindy, Jeff Billings and his wife, Brenda, and Jeremy Harrison and my wife."

MR. BARNES: Moving on to Line 21:

"Q: And at this meeting, you discussed with them your leaving Schlumberger, right?

"A: I told them that I had, in fact, resigned or retired, yes, sir.

"Q: Okay. And you told them where you were -- okay. And you told them you were going where?

"A: I told them I had plans to go to work at P.W.L."

MR. BARNES: Page 75, Line 9 -- Line 10:

"Q: But what time was the dinner? What time did it start?

"A: Around 6:30.

"Q: And when did you tender your resignation to Schlumberger?

"A: On or about 6:00 p.m.

"Q: Okay. So you didn't make the calls between 6:00 and 6:30 and have four people and all their wives drop everything and come over, right? Those calls were made beforehand?

"A: It was our anniversary dinner.

"Q: Your what? Anniversary, wedding anniversary?

"A: Wedding anniversary.

"Q: Okay. So you made the call sometime before you tendered your resignation, correct?

"A: Correct.

"Q: And what did -- and what did you tell each of these people as far as coming over with their wives for dinner?

"A: That it was my anniversary.

"Q: Everyone you invited attended?

"A: Except some personal family.

"Q: Well, but the only people who attended were Schlumberger employees and your wife, correct?

"A: Correct."

MR. BARNES: Page 76, Line 14:

"Q: So you tell them that you want to have them over for dinner because it's your anniversary. When they get there, you're talking about your resigning from Schlumberger and going to work for P.W.L., correct?

"A: I told them that that had occurred.

"Q: And you also told them they can come to work for P.W.L., didn't you?

"A: I told them that wasn't my decision.

"Q: You told them there was an opportunity for them to come to work for P.W.L.?

"A: I told them they needed to visit with Mr. Parker."

MR. BARNES: Page 77, Line 11:

"Q: You also told them that they needed to commit right then, correct?

"A: No, sir.

"Q: You told them that they would need to resign immediately from Schlumberger, didn't you?

"A: No, sir.

"Q: What's your explanation for all of these people resigning with no notice from Schlumberger?

"A: I don't have any personal knowledge of why they resigned.

"Q: Did you talk about how much money they would make?

"A: No, sir.

"Q: Did you tell them there would be a sign-on bonus?

"A: No, sir.

"Q: Was any money paid to them that night?

"A: No, sir.

"Q: Do you know whether sign-on bonuses were paid?

"A: No, sir.

non-compete agreement, you haven't complied with that agreement, have you?

"A: Can you be more specific?

"Q: Okay. Paragraph 5 says you won't directly or indirectly work for a business which competes with Schlumberger. You have worked for a business -- you have worked for a business which competes with Schlumberger, correct?"

MR. CLEARY: Withdraw the objection.

"A: I have worked for a business that competes with Schlumberger.

"Q: And that's P.W.L., correct?

"A: That's correct.

"Q: And what customers did you or did P.W.L. do work for between the time you left Schlumberger and when you ceased working for P.W.L. because of your restraining order?

"A: X.T.O., Unit, and Linn.

"Q: And you were involved in getting business from all of those clients for P.W.L., weren't you?

"A: Can you be more specific?

"Q: Well, you went and met with X.T.O., correct, after you left Schlumberger?

"A: I talked to X.T.O., yes.

"Q: Who did you talk to?

"A: Mark Paige.

"Q: That's someone that you had done business with while at Schlumberger, correct?

"A: Correct."

MR. BARNES: Page 13, Line 9:

"Q: When did you first talk to X.T.O. after you resigned?

"A: September 17th.

"Q: And so you resigned on the 16th?

"A: That's correct."

MR. BARNES: Page 14, Line 5:

"Q: What did you tell them?

"A: That I had retired from Schlumberger.

"Q: Well, why did you choose the term 'retired'?

"A: Because it -- when I actually did retire, I did retire. When I sent that retirement letter, I had all intentions of retiring.

"Q: Meaning not working?

"A: From Schlumberger, that's correct.

"Q: Well, you have -- well, have you, for purposes of the jury who may think 'retire' means you're not working, you never intended to retire and not work? You were getting -- you were going to go back to work

somewhere, right?

"A: Eventually.

"Q: Okay. But you actually went to work for P.W.L. the very next day, right?

"A: The very next day, yes, sir."

MR. CLEARY: If we could go back to Page 13, beginning at Line 13:

"Q: The contact on the 17th was a phone call or meeting?

"A: Meeting.

"Q: Did you arrange for the meeting before the 17th?

"A: No, sir.

"Q: You just showed up?

"A: That's right.

"Q: At what location?

"A: McAlester."

MR. BARNES: Page 18, Line 22:

"Q: When was the first job for X.T.O. for P.W.L.?

"A: September the 29th."

MR. BARNES: Page 20, Line 18:

"Q: What communications did you have with Unit after you left Schlumberger?

"A: Told them the same, that I had

retired from Schlumberger.

"Q: Who?

"A: Gary Johnson.

"Q: What was his job?

"A: I'm not sure what his job title is.

"Q: He's someone you worked with while at Schlumberger?

"A: Yes.

"Q: In-person meeting?

"A: Yes.

"Q: What date was that?

"A: The same, on the 17th."

MR. CLEARY: Wait. Before we leave.

At Line 8:

"Q: Where is he located?

"A: Panola, Oklahoma."

MR. BARNES: Page 26, Line 15:

"Q: What other customers that you had dealings with at Schlumberger did you visit after you left Schlumberger?

"A: B.P.

"Q: Who else?

"A: Jones Energy.

"Q: Any others?

"A: Not that I remember.

"Q: And did B.P. eventually give P.W.L. business?

"A: I don't know.

"Q: Did Jones Energy?

"A: Yes."

MR. CLEARY: Before we leave:

"Q: And who did you meet with at B.P?

"A: Barney Davis.

"Q: Where is he located?

"A: Wilburton, Oklahoma."

MR. BARNES: Page 96, Line 15:

"Q: Let's go back to this Exhibit 3, your retention bonus contract, Subparagraph D. You're employed by P.W.L., which is a business that competes with Schlumberger, correct? It's Page 2D at the bottom.

"A: That's correct.

"Q: And it's your position that you shouldn't have to comply with any of these provisions in Paragraph 5A, B, C, or D, correct?"

MR. CLEARY: I'll withdraw the objection.

"A: I do not know.

"Q: Well, you're not complying with them, are you?"

MR. CLEARY: Misstates the evidence.

THE COURT: Overruled.

3:51 a.m., September 17th.

When did all these other people resign?

A Mr. Harrison resigned on the 17th as well. Mr. Cook, on the 17th as well. And Clint Slavens, I believe he was on the 18th. James Carpenter was on the 17th. Bobby Driver, 17th. And I believe Isaac Dees and Chad Walker were also on the 17th. Richard Parker and Kirk Gaither as well.

Q Okay. And in your career in managing people, have you seen anything like this with that many people resigning in one day?

A No, sir, I have not.

Q And on the line that has the Clint Slavens, Brian Cook, Jeremy Harrison, Daniel Harrison, Jeff Billings, what -- I know they're called slickline specialists, but what do they actually do for the company?

A So when we go to the well site to perform a slickline, ready line operation, the person responsible in charge of that operation would be the specialist. He's the one that coordinates with Mr. Myers back at the base, if he's there and then also with the company man on location.

Q And Mr. Billingham described a lot of the training that was provided. What kind of training did

And I went up into the office with Mr. McDaniels, who was there with me. He's our service quality office support. And Mr. Barney O'Toole who had met me there as well.

Q    Were you able to convince those two to stay?

A    No, sir, I wasn't.

Q    Okay. What was your understanding of the offer that was made by Professional Wireline?

A    It was my understanding that the offer was similar to the pay that they were making, with a signing bonus for some of them.

Q    What's your understanding of why -- well, did any of these employees give you any advanced notice, two weeks' notice?

A    None of them.

Q    Did -- how did that affect your business?

A    Drastically. If -- the -- one of our field specialists was out of the country at the time, so that left us basically with one field specialist and -- excuse me. Two field specialists. Sorry. Three field specialists and then some helpers, so being able to cover jobs.

It also -- they were the main contacts, so Mr. Myers was the focal point of our operation. So the -- for instance, the clients would call in to

when you questioned him about the drop in revenues while he was there, about business being slow?

A    I would tend to question it now --

MR. WISDOM:   Objection; based on speculation.

THE COURT:   Overruled.

THE WITNESS:   I would question it now based on what I know.

Q    (BY MR. DAVIS) What is it that you've learned?

A    That Mr. Myers has left the company and gone to work for the competition and left without, you know, discussing with us.  You know, that's not normal even, you know, in a retirement situation.

Q    Well, you heard the testimony from Mr. Myers and Mr. Parker about the text messages.  Does that cause you any concern?

A    Yes.  The text messages seem to show that Mr. Myers was -- and Mr. Parker were getting equipment, getting tools, and getting M.S.A.'s for their competing business.

MR. WISDOM:   Objection.  It's speculation and misstating what the documents actually say.

THE COURT:   Overruled.

Q    (BY MR. DAVIS) And was this in the same timeframe that the revenues for that location were

MR. WISDOM: Objection; leading.

THE WITNESS: That's correct.

THE COURT: Don't lead.

Q (BY MR. DAVIS) Now, I don't want to get bogged down in the missing tools. Now we have -- but we do have the tools from the rat pack. Have you done an investigation to see if Mr. Myers actually dropped them off at the McAlester location?

A Yes, we have. Immediately upon my arrival, one of our concerns was the security of the McAlester facility, concerns of missing tools and such. So I immediately had the crews go down to McAlester and go through the equipment and see what we have, inventory, and verify if any of the tools from -- that were in the rat pack were down there.

And so the crews went down there, and they started moving the equipment and informed me that, no, none of the tools were there.

Q And you --

A Similar tools were there, but not the ones that we specifically were looking for.

Q Okay. Would these tools be helpful for whoever was going to take over for Mr. Myers in servicing the customer?

A Yes, sir. It would save them some money, and

then some of them had to be, you know, ordered, may take a little bit longer. And not only that, they were kind of expensive. Specialized overshots for fishing operations were kept in Mr. Myers' pickup. He was the fishing expert, also. And so we don't have any of those.

Q    And you've heard -- well, you've testified about all of the customers he visited on the 17th. Would those tools be helpful if he was going to begin working immediately for customers for Professional Wireline?

A    Yes, sir, they would.

Q    And outside of the rat pack, have you done any investigation to see whether there were any other missing tools?

Well, let me ask a different question.

Do you have any -- was Mr. Myers responsible for ordering tools for Schlumberger?

A    He was. And I went back and had -- as this rolled out, I went back and had our financial controller pull our M.N.S. report and looked into the purchases that we had done throughout that year. And I guess starting back in April, we had purchased what could be construed as tooling out a truck. I mean, there were some specific gauge rings ranging from -- I believe it's

one-and-three-quarter, all the way up to four-and-a-half-inch O.D.

THE COURT REPORTER: I'm sorry. Up to?

THE WITNESS: Four-and-a-half-inch O.D.

Q (BY MR. DAVIS) So you -- are you saying that Mr. Myers was ordering tools while he was at Schlumberger in April?

A Yes, sir, he was. He did it throughout the year.

Q Okay. But a particular tool order, what was your concern about that when you say "tooling out a truck"?

A My concern was that he had maybe taken these tools and put them on the new trucks that he -- that they had at Profession Wireline.

Q Well, what was it?

MR. WISDOM: Your Honor, I object to the speculation of the illegal activity. He has no evidence. He's simply putting his conspiracy theories out there with no foundation.

THE COURT: Overruled.

Q (BY MR. DAVIS) Did you have any new trucks going into service in April of 2014?

A No, sir, we didn't.

Q And the order you looked at, what did it look

like was being ordered? Did it have to do with a new truck?

A Yeah, it would be gauge rings for a new truck. And then the other thing I noticed on this specific order is the overshots, and these grapples that are on here are required for overshots. Can't find those overshots -- I mean, those grapples. They're missing.

Q And what is Exhibit 8?

A Exhibit 8 is a -- it's from our -- it's a report from our financial controller that shows the P.O., the date, the vendor, the part number, and the description of the tools that were ordered.

Q And is Exhibit 8 a record kept in the ordinary course of a regularly conducted business activity at Schlumberger?

A For Schlumberger, yes, sir.

Q And was making this record a regular practice to document that activity?

A Yeah, it's a transaction from one system to the other. And we run the reports, you know, to check the purchases and stuff.

Q And was this record made at or near the time by or from information transmitted by someone with knowledge of the information in the report?

A This report was made by our financial

It's still hearsay. It still should not be admitted. And it's still irrelevant.

THE COURT: Well, as to the hearsay objection, as information that's compiled in the regular course of business, therefore, it's not hearsay. With the annotation removed from it, I'll admit it on that basis.

**DIRECT EXAMINATION (CONTINUED)**

BY MR. DAVIS:

Q    Okay. We talked about the --

THE COURT REPORTER: I'm sorry. That was No. 8?

MR. DAVIS: Yes.

Q    (BY MR. DAVIS) Mr. Myers, we talked about the first section. Is that the order for the -- what we call "loading up a new truck," so to speak, that's all the gauge rings?

A    The gauge rings, yes, sir.

Q    Okay. And, again, you weren't putting a new truck into service around that time?

A    No, sir.

Q    What about the May, June, July, no new truck?

A    (Shakes head negatively).

Q    And what about the next section? What -- what are your concerns about the orders there?

Q    (BY MR. DAVIS) And do you see on this list some of the customers that Mr. Myers and Mr. Parker testified and that you have some knowledge of them going after right after Mr. Myers resigned?

A    Yes, sir, I do.

Q    Is there any significance to the ones they chose off of the long list of customers?

MR. WISDOM:  Your Honor, calls for speculation.  Object.

THE COURT:  The question "Is there any significance" is kind of out there.  Could you narrow it down, please?

Q    (BY MR. DAVIS) Are you familiar with the revenues that are generated from those customers?

A    Yes, sir, I am.

Q    As far as size of client?

A    Yes, sir, I am.

Q    And is there any significance based on the size of client or the revenues of the ones they chose?

A    Yes, there is.

Q    What is that?

A    Probably say 75, 80 percent of our work came from B.P.  I'll probably say maybe 20 percent came from X.T.O.  And the other ones, Chevron and Linn, Jones, they were growing.

REPORTER'S RECORD
VOLUME 4 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 14-DCV-218252

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/2/2015 3:39:27 PM
CHRISTOPHER A. PRINE
Clerk

SCHLUMBERGER TECHNOLOGY ) IN THE DISTRICT COURT
CORPORATION )
)
)
vs. ) FORT BEND COUNTY, TEXAS
)
RICKY D. PARKER AND JAMES )
MYERS ) 268TH JUDICIAL DISTRICT

---

**TEMPORARY INJUNCTION HEARING**

---

On December 8, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Brady G. Elliott, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

MR. WISDOM: They could --

THE COURT: Counsel, are you going to testify?

MR. WISDOM: Well, your Honor, they're being accused of some serious things here based on pure speculation.

THE COURT: I understand, and I'll sustain the objection.

Q    (BY MR. DAVIS) Did you have any evidence that they were still running trucks during that time period?

A    Yes.  I believe there's social media showing that they had trucks operating during that time period.

Q    The waiver provision, did either of these gentlemen ever come to you and tell you that they were interested in opening a slickline, wireline, braided line business and try to get your permission?

MR. WISDOM: Objection; asked and answered.

THE COURT: Sustained.

Q    (BY MR. DAVIS) The C.C.T.S. business, did you have any problem with that?

MR. WISDOM: Objection; asked and answered.

THE COURT: I don't understand the question.

REPORTER'S RECORD
VOLUME 5 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 14-DCV-218253
APPELLATE COURT CASE NO. _____

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/2/2015 3:39:27 PM
CHRISTOPHER A. PRINE
Clerk

I, Mindy R. Hall, Official Court Reporter in and for the 268th District Court of Fort Bend, State of Texas, do hereby certify that the following exhibits constitute true and complete duplicates of the original exhibits, excluding physical evidence, offered into evidence during the Temporary Injunction Hearing in the above-entitled and numbered cause as set out herein before the Honorable Brady G. Elliott, Judge of the 268th District Court of Fort Bend County, State of Texas, and a hearing, beginning December 5, 2014.

I further certify that the total cost for the preparation of this Reporter's Record is $4,500 (expedited) and was paid by Defendants.

Schlumberger Confidential

# Parker Energy Service a Schlumberger Company
# Pocola, OK / Ft. Smith, AR



PLAINTIFF'S EXHIBIT 9

Was offered a % of the company but declined.

Employees that did not get along with Jimmy or Ricky.

☐ Employees that left the company to work for Professional Wireline.

☐ Employees that were offered a position with Professional Wireline but declined.

**WELL INTERVENTION**

**Schlumberger**

## Established Customers

| |
|---|
| BP AMERICA PRODUCTION COMPANY |
| CHEVRON APPALACHIA LLC |
| XTO ENERGY |
| CHESAPEAKE OPERATING |
| TALISMAN ENERGY USA, INC |
| CHEVRON |
| CHIEF OIL & GAS LLC |
| SOUTHWESTERN ENERGY CO |
| R.E. GAS DEVELOPMENT LLC |
| BHPB PET (FAYETTEVILLE) LLC |
| DEVON ENERGY |
| CHESAPEAKE APPALACHIA, L.L.C. |
| UNIT PETROLEUM |
| BHP PETROLEUM |
| LINN OPERATING, INC. |
| AMERADA HESS |
| JONES ENERGY, LTD |
| RICE DRILLING B LLC |
| KAISER FRANCIS OIL |
| WPX ENERGY WILLISTON, LLC |
| SAMSON RESOURCES |
| PETROQUEST ENERGY |
| SHELL |
| SENECA RESOURCES |
| WPX ENERGY APPALACHIA, LLC |
| ENERVEST OPERATING, LLC |
| CARRIZO OIL & GAS |
| GULFPORT ENERGY CORPORATION |
| D90 ENERGY COMPANY LLC |
| FOREST OIL |
| CNX GAS COMPANY, LLC |
| WILLIFORD ENERGY |
| BATTELLE MEMORIAL INSTITUTE - |
| WEISER BROWN |
| HINKLE OIL & GAS INC. |
| BP |
| NOBLE ENERGY INC. |
| VANGUARD PERMIAN, LLC |
| RANGE RESOURCES |
| SCHLUMBERGER CARBON SERVICES |
| BASIC ENERGY SERVICES |
| FOUNDATION ENERGY MANAGEMENT, LLC |
| SLAWSON EXPLORATION |
| STATOIL OIL & GAS, LP |
| EXCO RESOURCES |



PLAINTIFF'S
EXHIBIT
13

CONFIDENTIAL

SCHLUMBERGER/PARKER 000211

| |
|---|
| RED ROCKS OIL & GAS OPERATING LLC |
| CITRUS ENERGY CORPORATION |
| HESS OHIO DEVELOPMENTS LLC |
| WPX ENERGY MARCELLUS APPALACHIA LLC |
| LAWCO HOLDINGS, LLC |
| VERNON E FAULCONER INC |
| SCHMID PROPERTIES INC |
| SHIELDS OPERATING |
| WPX ENERGY ROCKY MOUNTAIN, LLC |
| EBERLY & MEADE |
| VITRUVIAN EXPLORATION, LLC |
| WHITMAR EXPLORATION |
| MANNSVILLE PUBLIC WORKS AUTHORITY |
| OAK VALLEY OPERATING, LLC |
| SANGUINE |
| ZINKE & TRUMBO |
| ANADARKO |

SCHLUMBERGER/PARKER 000212

**From:** Michael Yarbrough
**Sent:** Tuesday, September 16, 2014 6:28 PM
**To:** Matthew Billingham
**Subject:** Fwd: Retirement

Matt,
Just received this.
Rgds, Mike

Michael Yarbrough
Production Wireline a Schlumberger Company
361-522-0506


Begin forwarded message:

**From:** Barney OToole <BOToole@slb.com>
**Date:** September 16, 2014 at 6:24:15 PM CDT
**To:** Michael Yarbrough <MYarbrough@slb.com>
**Subject: Fwd: Retirement**

FYI

Regards,
Barney O.

Begin forwarded message:

**From:** Jimmy Myers <JMyers9@slb.com>
**Date:** September 16, 2014 at 6:03:11 PM CDT
**To:** Barney OToole <BOToole@slb.com>
**Subject: Fwd: Retirement**

PLAINTIFF'S EXHIBIT 17

**From:** JAMES MYERS <jmamtyab@crosstel.net>
**Date:** September 16, 2014 at 5:54:52 PM CDT
**To:** <jmyers9@slb.com>
**Subject: Retirement**

Barney,

I believe a large part of a companies success comes from great leadership, I've had many different types of persons as my leaders as have we all, but I truly believe that E&P's continued success & growth will be a result of hard work, determination, & great leadership that's field

SCHLUMBERGER/PARKER 000308

driven. I have been blessed to be part of this team & to work under someone who exhibits these types of qualities.

In our business where days, times, & people change so often the inability to make decisions quickly does impact our business.

Also noteworthy is the fact that while I ponder the possibility of retiring, everyone around me including my management has basically made the decision for me, rumors of steeling & catching wireline jobs outside of Schlumberger abound. Questions of supposed theft? My inability to talk with employees regarding concerns because they are in fact taking care of our customer base. Understanding what it takes to make a business run as far as personnel is concerned & those people are & always will be my number one priority.

Things are changing around me and I feel that my work ethic and my undeniable 20 plus years of employment stands for itself. As I began receiving calls and texts today about supposed happenings I am saddened that these years of service would be questioned and that doubt in my abilities is in the air. I am a man of accountability and to be questioned and grilled the way I have today is actually very disheartening. Wireline is my passion but I feel that my place within this company has phased out.

So with much prayer and a family decision this will be my letter of retirement I would like everyone concerned to know that I am in fact going to retire from Schlumberger effective immediately. I am a Godly man and I above all have placed my faith in God and know that this is the correct decision at this time.

Wishing everyone continued success.

Jimmy Myers

SCHLUMBERGER/PARKER 000309

239897 sh

CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, | ) ) ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) ) | |
| v. | ) ) | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, | ) ) | |
| Defendants. | ) | 268th JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

RICKY D. PARKER

DECEMBER 1, 2014

Volume 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION of RICKY D. PARKER, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 1st of December, 2014, from 2:54 p.m. to 5:39 p.m., before Shanon M. Hair, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Martin, Disiere, Jefferson & Wisdom, LLP, 808 Travis, 20th Floor, Houston, Texas 77002, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.


EXHIBIT

A. Yes.

Q. Did you tell Mr. Myers it would be okay to tell people that you would just take care of their medical bills until you got health insurance?

A. No.

Q. Were any of these employees paid any cash?

A. No.

Q. Were they given any sign-on bonuses?

A. No.

Q. Were they given anything other than base pay?

A. I think I paid COBRA for some of them. I gave them money for COBRA.

Q. So, if some of them were bragging to their former Schlumberger co-workers that they got some cash from you, they were just making that up?

MR. CLEARY: Objection. Form.

A. They didn't.

Q. (BY MR. DAVIS) Did any of your businesses pay them any money?

A. No.

Q. Did CCTS pay them any money?

A. No.

MR. CLEARY: Objection. Form.

Q. (BY MR. DAVIS) Did any of your businesses pay them any sign-on bonus?

CAUSE NO. 14-DCV-218252

SCHLUMBERGER TECHNOLOGY CORPORATION, )     IN THE DISTRICT COURT OF
)
)
     Plaintiff, )
)
v. )     FORT BEND COUNTY, TEXAS
)
RICKY D. PARKER and JAMES MYERS, )
)
     Defendants. )     268th JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF RICKY D. PARKER
DECEMBER 1, 2014

     I, Shanon M. Hair, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

     That the witness, RICKY D. PARKER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

     That the deposition transcript was submitted on _December 4___, 2014, to the witness or to the attorney for the witness for examination, signature and returned to me by _January 16_____, ~~2014~~ 2015;

     That the amount of time used by each party at the deposition is as follows:

        WILLIAM L. DAVIS, ESQ. - 2:21

     That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

     William L. Davis, Esq., Attorney for the Plaintiff;
     James M. Cleary, Esq., Attorney for the Defendants.

     I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.



Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 2nd day of December, 2014.

SHANON M. HAIR, Texas CSR 6513
Expiration Date: 12/31/15
ESQUIRE DEPOSITION SOLUTIONS
Firm Registration No. 03
1001 McKinney, Suite 805
Houston, Texas 77002
(713) 524-4600



FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on __1|15|15__;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to William L. Davis, Esq., Custodial Attorney;

That $985.85 is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me this __24th__ day of __March__, 2015.

_Shanon M. Hair by DF_
SHANON M. HAIR, Texas CSR 6513
Expiration Date: 12/31/15
ESQUIRE DEPOSITION SOLUTIONS
Firm Registration No. 03
1001 McKinney, Suite 805
Houston, Texas   77002
(713) 524-4600



239897 sh

CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, | ) ) ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) ) | |
| v. | ) ) | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, | ) ) | |
| Defendants. | ) | 268th JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

JAMES MYERS

DECEMBER 1, 2014

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of JAMES MYERS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 1st of December, 2014, from 9:10 a.m. to 2:41 p.m., before Shanon M. Hair, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Martin, Disiere, Jefferson & Wisdom, LLP, 808 Travis, 20th Floor, Houston, Texas 77002, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.



EXHIBIT

D

business, right?

A.   No, sir.

Q.   Some of them had concerns about going back to work for Mr. Parker, didn't they?

MR. CLEARY:  Objection.  Form.

A.   Not that they voiced to me, no, sir.

Q.   (BY MR. DAVIS)  Jeremy Harrison didn't have concerns about that?

MR. CLEARY:  Objection.  Form.

A.   Not he -- that he voiced to me.

Q.   (BY MR. DAVIS)  You also told them that they needed to commit right then, correct?

A.   No, sir.

Q.   You told them that they would need to resign immediately from Schlumberger, didn't you?

A.   No, sir.

Q.   What's your explanation for all of these people resigning with no notice from Schlumberger?

MR. CLEARY:  Objection.  Form.

A.   I don't have any personal knowledge of why they resigned.

Q.   (BY MR. DAVIS)  Did you talk about how much money they would make?

A.   No, sir.

Q.   Did you tell them there would be a sign-on bonus?

A.   No, sir.

Q.   Was any money paid to them that night?

A.   No, sir.

Q.   Do you know whether sign-on bonuses were paid?

A.   No, sir.

Q.   So, you're saying that all of these people, just by attending an anniversary dinner, decided to immediately resign with no notice to a start-up company?

MR. CLEARY:  Objection.  Form.

Q.   (BY MR. DAVIS)  That's your testimony?

MR. CLEARY:  Objection.  Form.

A.   Yes.

Q.   (BY MR. DAVIS)  Did you tell them that there wouldn't be any actual jobs for a while?

A.   No, sir.

Q.   You're saying no one questioned whether there was actually work ready for them to do?

MR. CLEARY:  Objection.  Form.

A.   No, sir.

Q.   (BY MR. DAVIS)  Did you tell them they would be paid until there was work?

A.   No, sir.

Q.   Before you had this dinner meeting, you had already talked to Ricky Parker about people potentially coming to work there, right?

MR. CLEARY: Objection. Form.

A. Not to my knowledge.

Q. (BY MR. DAVIS) The people who came over to PWL, did they get health insurance?

MR. CLEARY: Objection. Form.

A. Health insurance was issued, yes.

Q. (BY MR. DAVIS) From whom?

MR. CLEARY: Objection. Form.

A. SPMI.

Q. (BY MR. DAVIS) The staffing agency?

A. Yes.

Q. Did you -- was any mention made of what their pay might be if they came to PWL at this dinner meeting?

A. Not to my knowledge.

Q. So, were any of these employees who left Schlumberger paid any sort of sign-on bonus at PWL?

A. I do not know.

Q. Did you talk to them about PWL not having so many regulations and forms and things like that that they would have to worry with?

A. Not to my knowledge.

Q. Before you resigned from Schlumberger, did you ever tell any of the Schlumberger employees that you had concerns about Schlumberger shutting down the operation and requiring them to move to Oklahoma City?

CAUSE NO. 14-DCV-218252

SCHLUMBERGER TECHNOLOGY          )          IN THE DISTRICT COURT OF
CORPORATION,                     )
                                 )
        Plaintiff,               )
                                 )
V.                               )          FORT BEND COUNTY, TEXAS
                                 )
RICKY D. PARKER and JAMES MYERS, )
                                 )
        Defendants.              )          268th JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF JAMES MYERS
DECEMBER 1, 2014

        I, Shanon M. Hair, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

        That the witness, JAMES MYERS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

        That the deposition transcript was submitted on December 4, 2014, to the witness or to the attorney for the witness for examination, signature and returned to me by January 14, ~~2014~~ 2015;

        That the amount of time used by each party at the deposition is as follows:

            WILLIAM L. DAVIS, ESQ. - 4:00

        That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

            William L. Davis, Esq., Attorney for the Plaintiff;
            James M. Cleary, Esq., Attorney for the Defendants.

        I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.



Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 2nd day of December, 2014.

_(signature)_

SHANON M. HAIR, Texas CSR 6513
Expiration Date: 12/31/15
ESQUIRE DEPOSITION SOLUTIONS
Firm Registration No. 03
1001 McKinney, Suite 805
Houston, Texas 77002
(713) 524-4600



FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on __1/15/15__ ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to William L. Davis, Esq., Custodial Attorney;

That $1445.41is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me this __24th__ day of __March__, 2015.



_Shannon M. Hair by DF_
SHANON M. HAIR, Texas CSR 6513
Expiration Date: 12/31/15
ESQUIRE DEPOSITION SOLUTIONS
Firm Registration No. 03
1001 McKinney, Suite 805
Houston, Texas 77002
(713) 524-4600



Q.   Who?

A.   Gary Walters.

Q.   Where did he come from?

A.   He actually was working a little while for CCTS and then I moved him over into Professional Wireline because he had some wireline experience.

Q.   Okay.  And that's it?

A.   I think so.

Q.   So, to date, since Professional Wireline's been in business, only four people came from somewhere other than Schlumberger, and two of those four are relatives, right?

A.   Correct.

Q.   So, let's talk about this hiring.  What's your explanation for how it turned out that eleven Schlumberger employees resigned with no notice to go to work for your new company?  How did that happen?

        MR. CLEARY:  Objection.  Form.

A.   I don't know how that happens.  I got a call -- and I can't remember if it was Daniel or -- Harrison or Jeremy Harrison about Professional Wireline.  They asked if they could come over and I told them, "Sure."  They asked what about their helpers and I said, "Sure."  I said -- I think -- I think that was it.  Then I had people show up there the next morning.  I also gave Jimmy $20,000 to distribute in hire bonuses

Q.   (BY MR. DAVIS)  Show up -- well, okay.  Let's talk about Daniel and Jeremy.  When did they call you?  We know

ESQUIRE
SOLUTIONS

EXHIBIT
E
tabbies


Q. Were they paid a job -- a sign-on bonus?

A. ~~No.~~ Yes. A new hire bonus

Q. Did you start paying them before there was actual work to do?

A. Before we caught jobs?

Q. Yes.

A. Yes.

Q. What was -- you started paying them as of the 17th?

A. I think so, some of them on the 17th.

Q. Daniel and Jeremy never came over?

A. Came over where?

Q. Came -- did you ever meet with them face to face about them coming to work for PWL?

        MR. CLEARY: Objection. Form.

A. Not until the -- I think it was on the 17th.

Q. (BY MR. DAVIS) Okay. You met with them on the 17th?

A. 17th or 18th. I --

Q. Okay. They came over to your house, shop? Where did you meet?

A. Came to the shop on 112.

Q. Okay. And that's the same shop they had been coming to while still working for Schlumberger, right?

A. Daniel and Jeremy?

Q. Well, who all was coming to that shop?

A. Not that I know of.

A.    Yes.

Q.    Did you tell Mr. Myers it would be okay to tell people that you would just take care of their medical bills until you got health insurance?

A.    No.

Q.    Were any of these employees paid any cash?

A.    ~~No.~~ yes

Q.    Were they given any sign-on bonuses?

A.    ~~No.~~ yes. They were given new hire bonuses

Q.    Were they given anything other than base pay?

A.    I think I paid COBRA for some of them.  I gave them money for COBRA.

Q.    So, if some of them were bragging to their former Schlumberger co-workers that they got some cash from you, they were just making that up?

MR. CLEARY:  Objection.  Form.

A.    They didn't.

Q.    (BY MR. DAVIS)  Did any of your businesses pay them any money?

A.    ~~No.~~ yes.  PWL

Q.    Did CCTS pay them any money?

A.    No.

MR. CLEARY:  Objection.  Form.

Q.    (BY MR. DAVIS)  Did any of your businesses pay them any sign-on bonus?

MR. CLEARY: Objection. Form. How many times are we going to ask him this question?

A. No. *Paid new hire bonuses*

Q. (BY MR. DAVIS) So, if they were telling people who stayed at Schlumberger that they got bonus money, they were just making it up?

MR. CLEARY: Objection. Form.

A. I didn't give them any. *They were paid new hire bonuses*

Q. (BY MR. DAVIS) When did these employees first start doing work for PWL?

A. I guess from -- some of them, from the 17th on.

Q. Did you talk to any of them about whether it would be a nice thing to do to give Schlumberger two weeks' notice?

A. I didn't talk about that.

Q. You told them that they needed to resign immediately, didn't you?

A. No.

Q. As a business owner, don't you expect people to give two weeks' notice when they leave --

MR. CLEARY: Objection. Form.

Q. (BY MR. DAVIS) -- so you don't be put in a bind?

A. It's nice. Doesn't happen much in the oil field.

Q. Kind of leaves you in a bind when eleven people resign with no notice, doesn't it?

MR. CLEARY: Objection. Form.

MARCH 24, 2015


WILLIAM DAVIS ESQ.
JACKSON LEWIS, PC - DALLAS
SUITE 2500
500 NORTH AKARD STREET
DALLAS, TX 75201.6656

Case:              SCHLUMBERGER TECH VS. PARKER
Deposition of:     JAMES MYERS
Proceeding Date:   12/01/2015
Our Assignment #   239897

Dear Sir or Madam,

☒ **The witness returned document(s). We** received the following:

☐ Original Transcript    ☒ Original Changes & Signature Pages

☒ With Changes
☐ Without Changes
☒ Signed and Executed
☐ Unsigned

☒ Documents arrived within the allotted time frame. We filed a Rule 203 certificate with the Clerk of the Court in the appropriate venue on ___3/24/15___ . The certificate indicates that changes were received within the allotted time frame.

☐ Documents arrived after the allotted time limit expired. The Rule 203 certificate was previously filed and forwarded to you. The certificate indicates that changes were not received within the allotted time frame. We are forwarding these changes to you as a courtesy, for your records.

☐ **We did not receive any documents** within the allotted time frame. We filed a Rule 203 certificate with the Clerk of the Court in the appropriate venue on _____ . The certificate indicates that no changes were received within the allotted time frame.

☐ Signature waived

If you have any questions, please contact us at 800.211.DEPO, or errata@esquiresolutions.com. We appreciate your business and look forward to serving you again in the future.

Thank you,
Errata Processing Division



ESQUIRE
S O L U T I O N S


EXHIBIT
F

Esquire - Atlanta
101 Marietta Street
2700 Centennial Tower
Atlanta, GA 30303

CHANGES AND SIGNATURE

WITNESS NAME: ___Jimmy Myers___       DATE OF DEPOSITION: <u>December 1, 2014</u>

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 7 | 10 | Add: I have had conversations but not about business. Also, since my deposition, I have asked some for a reference. | **Clarification** |
| 14 | 17 | Change: Yes | **Clarification** |
| 29 | 8 | Change: Maybe. I'm not sure | **Clarification** |
| 29 | 19 | Change: Yes. | **Clarification** |
| 60 | 20 | Add: Also a Parker Wireline time sheet | **Clarification** |
| 72 | 20 | Change: Yes, sir | **Clarification** |
| 72 | 22 | Change: Yes, sir | **Clarification** |
| 72 | 25 | Change: Yes, sir | **Clarification** |
| 78 | 1 | Change: Not in so many words | **Clarification** |
| 78 | 3 | Change: Yes. | **Clarification** |
| 78 | 5 | Change: I paid $5,000 to each of Jeff Billings, Brian Cook, Daniel Harrison and Jeremy Harrison | **Clarification** |
| 79 | 1 | Change: Yes, sir | **Clarification** |
| 79 | 4 | Change Yes | **Clarification** |
| 82 | 13 | Change: I don't remember. | **Clarification** |

| 83 | 17 | Change: They were paid new hire bonuses. | Clarification |
| 106 | 13 | Change: Yes | Clarification |
| 110 | 20 | Change: It's possible; I don't remember | Clarification |
| 111 | 13 | Change: Yes, but I didn't give him anything | Clarification |
| 111 | 15 | Change: I don't remember | Clarification |
| 112 | 13 | Change: Yes | Clarification |
| 112 | 21 | Change: He already knew. | Clarification |
| 113 | 3 | Change: One of us called the other; I can't remember who called who. We met after that. | Clarification |
| 136 | 10 | Change: I received one check from PWL and one from CCTS. | Clarification |

except as noted above.

_____
JAMES MYERS

THE STATE OF Arkansas )

COUNTY OF Sebastian )

Before me, Martha R. Milam , on this day personally appeared JAMES MYERS, known to me (or proved to me under oath or through _____ ) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 5th day of January , 2015 .

_____
NOTARY PUBLIC IN AND FOR

THE STATE OF Arkansas

MARTHA R. MILAM
Notary Public-Arkansas
Sebastian County
My Commission Expires 08-15-2023
Commission # 12395621



CAUSE NO. 14-DCV-218252

SCHLUMBERGER TECHNOLOGY                )        IN THE DISTRICT COURT OF
CORPORATION,                           )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        FORT BEND COUNTY, TEXAS
                                       )
RICKY D. PARKER and JAMES MYERS,)
                                       )
        Defendants.                    )        268th JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF JAMES MYERS
DECEMBER 1, 2014

        I, Shanon M. Hair, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

        That the witness, JAMES MYERS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

        That the deposition transcript was submitted on December 4, 2014, to the witness or to the attorney for the witness for examination, signature and returned to me by January 16, 2014; 2015

        That the amount of time used by each party at the deposition is as follows:

            WILLIAM L. DAVIS, ESQ. - 4:00

        That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

            William L. Davis, Esq., Attorney for the Plaintiff;
            James M. Cleary, Esq., Attorney for the Defendants.

        I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.



Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 2nd day of December, 2014.



SHANON M. HAIR, Texas CSR 6513
Expiration Date: 12/31/15
ESQUIRE DEPOSITION SOLUTIONS
Firm Registration No. 03
1001 McKinney, Suite 805
Houston, Texas  77002
(713) 524-4600

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on __1|5|15__ ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to William L. Davis, Esq., Custodial Attorney;

That $1445.00 is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me this 24th day of March, 2015.



_____
SHANON M. HAIR, Texas CSR 6513
Expiration Date:  12/31/15
ESQUIRE DEPOSITION SOLUTIONS
Firm Registration No. 03
1001 McKinney, Suite 805
Houston, Texas  77002
(713) 524-4600



CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, | § § | |
| Defendants. | § § | 268th JUDICIAL DISTRICT |

**ORDER DENYING DEFENDANT RICKY PARKER'S**
**MOTION TO MODIFY OR DISSOLVE TEMPORARY INJUNCTION**

On this day came to be heard Defendant Ricky D. Parker's Motion to Modify or

Dissolve Temporary Injunction., After consideration of the Motion, the Response thereto, and

the arguments of counsel, the Court is of the opinion that said motion should, in all things, be

DENIED.

SIGNED this _____ day of May 2015.


_____
JUDGE PRESIDING